UNITED STATES of America

v.

James A. KELLY, Jr.

Crim. No. 80–316–T.

United States District Court, D. Massachusetts.

July 9, 1981.

D. Lloyd Macdonald, Asst. U. S. Atty., Edward F. Harrington, U. S. Atty., Boston, Mass., for the United States.

George A. McLaughlin, Jr., John S. Leonard, The McLaughlin Bros., Boston, Mass., for defendant.

## ORDER

TAURO, District Judge.

The United States Attorney has moved, under the provisions of 28 U.S.C. Sec. 455(a), that I be disqualified from "conducting any further proceedings in this matter." Defendant's motion for Judgment of Acquittal is the only proceeding pending in this case. That motion is based on several grounds, including the allegation that the United States Attorney knowingly used false testimony during the six week extortion trial which ended in a mistrial, after the jury reported five times that it was deadlocked.[1]

According to the United States Attorney, his motion was "precipitated" by a news columnist's speculation that a relationship existed between the defendant and me fifteen years ago which now affects my ability to be impartial in this case.[2]

In considering the merit of the United States Attorney's motion, reference must first be made to the legislative history of section 455(a) which makes clear the intent of Congress that its provisions:

> ... should not be used by judges to avoid sitting on difficult or controversial cases.

That legislative history goes on to instruct that:

> ... in assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice.

H.Rep.No.1453, 93d Cong., 2d Sess., [1974] U.S.Code Cong. & Admin.News 6351, 6355 (emphasis in original).

The Court of Appeals only a few weeks ago re-addressed the standard to be followed in assessing the merit of a section 455(a) motion when they reviewed and affirmed a decision by Judge Garrity not to disqualify himself in a criminal case.[3] In

---

1. Whether defendant's motion for judgment of acquittal will be allowed or denied remains to be decided. Consideration of any question concerning possible retrial would, therefore, be presumptive and premature.

2. The details of all relevant circumstances are discussed fully in the accompanying memorandum.

3. It is clear that the challenged judge decides in the first instance the validity of the motion for disqualification. For a discussion of the law related to this issue, see accompanying Memorandum, Section V, P. 43.

doing so, the court reaffirmed its holding in *United States v. Cowden*, 545 F.2d 257 (1st Cir. 1976), *cert. denied*, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977) that a charge of lack of impartiality must be:

> *grounded on facts* that would create a reasonable doubt concerning the judge's impartiality ... in the mind of the reasonable man. (emphasis supplied)

*U. S. v. Mirkin*, 649 F.2d 78 at 82 (1st Cir. 1981).

And so, it is clear that the threshold admonition of the First Circuit standard is that a charge of partiality must be based on facts, and not on mere suspicion or conjecture.

Chief Judge Coffin provides additional guidance as to the controlling standard in his statement that:

> A trial judge must hear cases unless some reasonable factual basis to doubt the impartiality of the tribunal is shown by some kind of probative evidence.

*Blizard v. Frechette*, 601 F.2d 1217, 1221 (1st Cir. 1979)

To permit any lesser standard than that requiring a "factual basis" and "probative evidence" to support a charge of questionable impartiality would subvert the purpose of our "blind draw" assignment system, which is to prevent the universally condemned practice of judge shopping.

I did not ask for the Kelly case. It was assigned to me pursuant to the district court's "blind draw" system. No objection was made by either party to that assignment. No objection was made to the manner in which I handled the six week trial—until a post trial motion was filed by the defendant accusing the United States Attorney of using false testimony during the trial. Only then was my partiality challenged by the United States Attorney.

As has been detailed by me in the accompanying memorandum, an investigation conducted by the F.B.I. has established that *in fact* no relationship ever existed between the defendant and me, let alone one that would meet the standards for a disqualification motion. It is now clear that the United States Attorney's motion to disqualify me was based on innuendo and rumor—and that it was not "grounded on facts" or on "probative evidence."

Under our system, judges do not choose their cases, and litigants do not choose their judges. We all operate on a blind draw system. Sometimes, both litigants and judges are disappointed by the luck of the draw. But the possibility of such disappointment is a risk judges and litigants alike must assume if we are to have a blind draw system that is characterized by its integrity.

As the accompanying Memorandum makes clear, to allow this motion, given the underlying facts and circumstances here, would be to establish' an unsettling precedent that would frustrate the purpose of our blind draw system and encourage the inherently undesirable practice of judge shopping.

I am, therefore, denying the United States Attorney's motion to disqualify me. I have also respectfully requested that my decision and my memorandum in support thereof be reviewed by the Judges of the United States Court of Appeals.

*It is therefore ordered that*:

1) The United States Attorney's motion to disqualify is denied.

2) My decision is referred to the Judges of the United States Court of Appeals for review. (See supplement)

3) Further proceedings are stayed.

SUPPLEMENT

July 9, 1981

The Honorable Frank M. Coffin
Chief Judge
United States Court of Appeals
156 Federal Street
Portland, Maine 04112

RE: UNITED STATES v. KELLY

Criminal No. 80–316–T

Dear Chief Judge Coffin:

I have denied a motion filed by the United States Attorney, under 28 U.S.C.

§ 455(a), to disqualify me "from conducting any further proceedings in this matter." My reasons for doing so are outlined briefly in my order and are detailed extensively in its accompanying memorandum.

The underlying litigation involved a six week trial of a one-count indictment charging the defendant with having committed extortion in violation of the Hobbs Act, 18 U.S.C. § 1951. A mistrial was declared because the jury was deadlocked.

The "further proceedings" that are pending involve various post-trial motions. The most significant of these is a pending multi-faceted motion for judgment of acquittal, filed at the conclusion of the evidence and renewed by the defendant in accordance with Rule 29(c) of the Federal Rules of Criminal Procedure.

I am mindful that the United States Attorney may not have a right to appeal my denial of his motion, prior to my considering further the remaining motions in this case. For that reason, I respectfully request that my order and its accompanying memorandum be reviewed by the Judges of the Court of Appeals under your general supervisory powers. Further action on the pending motions has been stayed by me.

Sincerely,

(s) Joseph L. Tauro

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | Basic Legal Principles | 1033 |
| II. | Procedural History | 1033 |
| | A) Pretrial Motions | 1033 |
| | B) The Trial | 1034 |
| | C) Jury Instructions | 1035 |
| | D) Jury Deliberations | 1036 |
| | E) Evidentiary Rulings At Trial | 1038 |

**1.** It is clear that the challenged judge decides in the first instance the validity of the motion for disqualification. For a discussion of the law related to this issue, see Section V at p. 1050.

**2.** Whether defendant's motion for judgment of acquittal will be allowed or denied remains an open question. Consideration of any question concerning possible retrial would, therefore, be presumptive and premature.

## TABLE OF CONTENTS—Continued

| | | Page |
|---|---|---|
| | F) Conduct Of The Trial | 1038 |
| | G) Post-Trial Motions | 1039 |
| III. | The Facts | 1040 |
| | A) The David Wilson Columns | 1041 |
| | B) The Peter Lucas Columns | 1045 |
| IV. | The Timing Of The United States Attorney's Motion | 1047 |
| V. | Who May Hear A Motion To Disqualify | 1050 |
| | Conclusion | 1051 |

■ At issue is the United States Attorney's post-trial motion to disqualify me from "conducting any further proceedings in this matter." [1] Defendant's motion for judgment of acquittal is the only proceeding pending in this case. That motion is based on several grounds, including the allegation that the United States Attorney knowingly used false testimony during the six week extortion trial which ended in a mistrial, after the jury reported five times that it was deadlocked.[2]

The mistrial was declared on April 29, 1981. Several weeks later, on June 16, the United States Attorney filed this motion seeking my disqualification, under 28 U.S.C. § 455(a),[3] which provides that:

> Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

The United States Attorney states that his motion to disqualify me was "precipitated" by the informed lay views of two Boston political writers, David Wilson of the *Boston Globe*, and Peter Lucas of the *Boston Herald American*. Given that the thrust of the United States Attorney's motion relies on the "informed lay views" of those political writers, it is appropriate that their columns, and those of others, be analyzed by me throughout this memorandum.

**3.** In its supporting memorandum, the government points out that it does not argue that I have any "actual bias or prejudice" in this matter. Government's Memorandum in Support of Disqualification (Government's Memorandum) at p. 34 n. 17.

# I

## BASIC LEGAL PRINCIPLES

It is useful at the outset, however, to examine the legislative history in order to get a perspective as to the intent of the Congress in enacting section 455(a). In relevant part, that legislative history states:

[Section 455(a)] should not be used by judges to avoid sitting on difficult or controversial cases. . . .

. . . [I]n assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice.[4]

Two recent decisions of the First Circuit draw on that legislative history and emphasize further that a federal judge may not be disqualified on the basis of allegations which amount to nothing more than suspicion, conjecture and innuendo.

A few weeks ago, the Court of Appeals affirmed a decision by Judge Garrity not to disqualify himself, and in doing so reasserted that the issue in such matters is

. . . whether the charge of impartiality *is grounded on facts* that would create a reasonable doubt concerning the judge's impartiality . . . in the mind of the reasonable man.[5]

In affirming a decision by Judge Caffrey[6] not to disqualify himself, Chief Judge Coffin emphasized:

A trial judge must hear cases unless some reasonable factual basis to doubt the impartiality or fairness of the tribunal is shown by some kind of probative evidence.[7]

And so, the scope and purpose of this memorandum is to analyze whether the United States Attorney's motion to disqualify me was supported by "probative evidence" and a "factual basis"—or whether it was merely the product of conjecture, suspicion and innuendo.[8]

# II

## PROCEDURAL HISTORY

A) *Pretrial Motions*

On September 23, 1980 a federal grand jury returned a one-count indictment charging the defendant with extortion in violation of the Hobbs Act, 18 U.S.C. § 1951.

The case was assigned to me on September 23, 1980 by means of the District Court's traditional "blind draw system."

No motion to disqualify me was filed by either party until nine months later on June 16, 1981, when the United States Attorney filed this motion under section 455(a).

Defendant filed a motion to dismiss the indictment on January 5, 1981, alleging three instances of prosecutorial misconduct.

The defendant requested the opportunity for discovery and for an evidentiary hearing in order to establish a factual basis for

---

4. H.Rep.No.1453, 93d Cong., 2d Sess., [1974] U.S.Code Cong. & Admin.News 6351, 6355 (emphasis in original).

5. *United States v. Mirkin*, 649 F.2d at 82 (1st Cir. 1981) *quoting United States v. Cowden*, 545 F.2d 257, 265 (1st Cir. 1976), *cert. denied*, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977) (emphasis supplied).

6. Judge Caffrey's opinion may be found at *U. S. v. Booth*, 454 F.Supp. 318 (D.Mass.1978).

7. *Blizard v. Frechette*, 601 F.2d 1217, 1221 (1st Cir. 1979).

8. The government's mammoth filings in support of its motion consist of F.B.I. interviews with various persons, as well as many news clips. For the purpose of this motion, I will accept those interviews and other submissions at face value. It is unnecessary, therefore, to hold an evidentiary hearing with respect to this motion at this time.

his motion to dismiss. That request and the motion to dismiss were denied by me on February 9.

Also denied by me on February 9 was defendant's motion for an indefinite continuance.

The case was assigned a March 1981 trial date.

## B) *The Trial*

The trial of this one-count indictment commenced on March 19, 1981. The trial lasted for approximately six weeks, but this was not a complex case.

Although the government did not need to prove actual threats in order to obtain a Hobbs Act conviction,[9] its theory of proof at trial was that extortionate threats were in fact made, by the defendant to the alleged victims, at meetings in Florida during November 1970. The evidence as to what occurred at the November 1970 Florida meetings was in sharp conflict. The credibility of the witnesses was the most contested issue.

The United States Attorney acknowledges that the "crucial testimony" relied on by the government to prove the alleged extortion was presented by Frank Masiello, who testified under a grant of immunity, and William Masiello, an admitted perjurer, who testified under a similar grant of immunity.[10]

The United States Attorney also acknowledges that the defendant's November 1970 Florida meetings with John Gardner,

then an officer of the alleged victim company, were:

"key" [and] . . . involved Kelly's initial approach to [the victim] concerning his alleged extortion of the money. Frank Masiello's testimony concerning the meetings was subject to sharp dispute at trial.[11]

Frank Masiello testified that the defendant, in no uncertain terms, made extortionate threats to Mr. Gardner at that November 1970 Florida meeting.[12] Mr. Gardner's version of what happened at that meeting, however, was entirely contradictory. This point is conceded by Assistant United States Attorney Macdonald's affidavit,[13] in which he states:

At the trial, Frank Masiello's version of the first meeting with Gardiner was contradicted by Gardiner, who said that he recalled only a brief encounter with Kelly and the conversation was limited to friendly small talk. . . . It was contradicted also by Kelly, who described the Gardiner meeting in terms essentially similar to Gardiner's.[14]

This is an example of the credibility issues that permeated, if not dominated, this case.

After the government rested, defendant moved for a judgment of acquittal. I heard argument on that motion for more than two hours. At the conclusion of argument, I told both counsel that, if the case were being tried jury waived, I would find the defendant not guilty, because I simply could not believe the Masiello brothers beyond a reasonable doubt.[15] I also told both counsel

---

**9.** *United States v. Hathaway*, 534 F.2d 386, 393 (1st Cir.) *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976).

**10.** Government's Answer to Defendant's Offer of Proof Re: Evidentiary Hearing at p. 4.

**11.** Government's Memorandum at p. 24.

**12.** The government concedes that Frank Masiello's testimony concerning the key 1970 Florida meetings was "one of the weakest portions of the government's case." *Government's Memorandum* at p. 24.

**13.** Mr. Macdonald is the Assistant United States Attorney who tried this case for the government.

**14.** Affidavit of D. Lloyd Macdonald (June 16, 1981) at p. 5.

**15.** Presiding judges routinely and properly make judgments as to the credibility of witnesses in jury cases, "almost as a reflex process." *United States v. Mirkin, supra* at 82. In *Mirkin*, the First Circuit found nothing improper in the fact that in deciding the defendant's motion for a new trial, Judge Garrity relied in part on an assessment of the defendant's credibility which he made during the defendant's jury trial. Indeed, the court noted that "[m]aking credibility assessments is daily grist for a trial judge." *Id.*

that I considered the government's case to be very thin, but that I felt sufficient evidence had been presented to create a jury issue. I, therefore, denied defendant's motion for judgment of acquittal.

The defense then proceeded with its case, offering the testimony of several witnesses, including the defendant. After both parties rested, the defendant again moved for judgment of acquittal. I reserved decision on that motion pursuant to Fed.R.Crim.P. 29(b).

C) *Jury Instructions*

Both parties rested on April 26, 1981. During the afternoon of April 27, I gave counsel the jury instructions I proposed to give the following day. Later that afternoon, I met with counsel in my lobby to review any objections or suggestions they might have with respect to my proposed instructions. Relatively few changes were requested by them, and most of those were adopted by me.

Mr. Macdonald's major objection was to that portion of my proposed instructions in which I intended to suggest to the jury that, as a threshold matter, they focus on the apparently conflicting evidence as to what happened at the "key" November 1971 Florida meetings, at which the defendant is alleged to have made the extortionate

threats that were the basis of this indictment.[16] Mr. Macdonald specifically stated, however, that my summation of the conflicting evidence was fair. Indeed, Mr. Macdonald's summary of the conflicting evidence, contained at page 5 of his affidavit, tracks in tone and substance the instructions given by me to the jury.[17]

Defense counsel's major request concerning my proposed instructions was that I tell the jury that I did not believe the Masiello brothers' testimony beyond a reasonable doubt, consistent with the comments made by me when I denied defendant's motion for judgment of acquittal. In making that request, Mr. McLaughlin noted that state Superior Court judges, such as his uncle, former Chief Justice Walter McLaughlin, do not have the right to comment on the evidence, but that federal judges do have such a right.[18]

I denied Mr. McLaughlin's request, and said that, although I had serious doubts as to the Masiellos' credibility, I was going to leave the issue of credibility to the jury, without comment as to my views.[19]

My instructions to the jury on credibility were basically standard boilerplate, including my instructions as to the manner in which they were to evaluate the testimony of immunized witnesses and that of an admitted perjurer.[20]

---

**16.** That conflicting evidence has already been summarized by me in Section IIB at pp. 1034–1035.

**17.** The government has attached my instructions as an exhibit to its submissions concerning this motion to disqualify. See Exhibit A to Affidavit of D. Lloyd Macdonald, June 16, 1981. See my instructions at pp. 10–15. Mr. Macdonald's comments contained in his affidavit are quoted by me in Section IIB at p. 1034.

**18.** The Supreme Court has made clear that a federal judge has discretion to comment to the jury upon the weight of the evidence and the credibility of the witnesses, if he also instructs the jury that they are not bound by the judge's comment.

In charging the jury, the trial judge is not limited to instructions of an abstract sort. It is within his province, whenever he thinks it necessary, to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence, by drawing their at-

tention to the parts of it which he thinks important; and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination.

*Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933). For a thorough analysis of the power of a federal judge to sum up and comment upon the evidence, see 1 Weinstein & Berger, Weinstein's Evidence ¶ 107 (1980).

**19.** Mr. McLaughlin's partner, Mr. Leonard, sets forth these events, as well in his affidavit. See Defendant's Opposition to Motion for Disqualification, Exhibit 3 at p. 16. Mr. Macdonald does not dispute these events in either of his affidavits.

**20.** See my instructions at pp. 6–8 and 17–19. See also 1 Devitt & Blackmar, Federal Jury Practice and Instructions, §§ 17.04 and 17.05 (3rd ed. 1977).

As stated, my full instructions to the jury have been submitted as an exhibit and are available for review and comment by any student, professor, judge or lay person. I have reviewed them again and regard them to be thorough and fair as a matter of tone and substance, and correct as a matter of law.

D) *Jury Deliberations*

Counsel completed their closing arguments to the jury at approximately 1:00 p. m. on April 28. After a break for lunch, I gave my instructions to the jury. At approximately 3:30 p. m., the jury retired to deliberate.

Forty minutes later, the jury sent me a note requesting transcripts of the trial testimony of several witnesses. With the approval of both counsel, that request was denied and the jury continued their deliberations until 6:25 p. m. At 6:25 p. m., mindful that the dinner hour was at hand, I wrote the forelady a note, with approval of both counsel, asking whether the jury wished to continue deliberating that evening or whether they wished to adjourn until the following morning. The forelady responded that the jurors wished to adjourn for the evening. Defendant again moved not to sequester the jury, and I allowed that motion, without objection by the government. I excused the jury until the next morning, with appropriate instructions not to discuss the case with anyone.

The jury resumed their deliberations at 9:30 a. m. on April 29. Deliberations continued until 12:40 p. m., when the jurors were taken to lunch by the United States Marshal. The jury returned from lunch at 1:20 p. m.

At 4:11 p. m., the forelady sent a note to the court stating that the jury had reached an impasse, and that the jurors did not feel that they would be able to reach a unani-

mous verdict. I then called counsel in for a lobby conference to advise them of the jury's communication and to seek counsel's views as to what step should be taken next.

While we were in my lobby discussing the jury's report that they were deadlocked, I received an unsolicited second note from the forelady of the jury, as follows:

Your Honor,

 Eleven jurors have reached a verdict.

 One juror will not agree with us under any circumstances.

 (over)

 s/ B. Schneider

One juror made the statement that the government had no case to begin with and it never should have been brought to trial—this was before we looked at any evidence.

 s/ B. Schneider

That note was also shown to counsel. With their agreement, I sent a note to the jury seeking to clarify the status of their deliberations. The response, signed by all twelve jurors, stated that the vote was eleven to one for conviction, and that the jurors were absolutely certain that they would be unable to reach a unanimous verdict. Both counsel read that note.

I then sought counsels' views as to what step should be taken next. The government's position was that the jury should be given supplementary instructions and sent back to deliberate. The defendant's position was that a mistrial should be declared.

Over the strenuous objection of defense counsel, I followed the suggestion of the government and brought the jury back to the courtroom. I then gave the jury, in precise form, the supplementary instructions suggested by the Court of Appeals when a trial court is faced with a deadlocked jury situation. *See United States v. Angiulo*, 485 F.2d 37, 40 n.3 (1st Cir. 1973).[21]

---

**21.** Those supplementary instructions were as follows:

 The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of

The jury resumed their deliberations at 6:07 p. m., following those supplementary instructions. Dinner was served to them in the jury room in order that they could continue their work.

Following another lobby conference with counsel, I sent the forelady a note at 7:25 p. m. asking whether the jurors thought it would be possible for them to reach a unanimous verdict. The forelady's response was ambiguous, and so, with agreement of counsel, I sent her another note at 7:40 p. m. Her reply to that note, signed by each of the twelve jurors, stated that even with further deliberations, there was no chance that the jury could reach a unanimous verdict.

It was clear at this point that the jury was hopelessly deadlocked. They had deliberated approximately thirteen hours over a two-day period and had four times advised the court and the parties that they were unable to reach a unanimous verdict. And so I once again brought the jury back to open court, where they confirmed for the fifth time that they were unable to reach a unanimous verdict.[22] I then discharged the jury, mindful of Chief Judge Coffin's admonition in the *Angiulo* case that:

> We have come a long way from the era when deadlocked jurors were locked into an oxcart and carried about with the judge until they reached a verdict, but perhaps not far enough.

*Id.* at 38–39.

Of course, there is nothing unusual about a jury being discharged as deadlocked after deliberating less than thirteen hours. The *Angiulo* case itself is such an example.

There the Court of Appeals reversed Angiulo's conviction *because a mistrial had not been declared*, despite the jury's report of being deadlocked after less than ten hours of deliberations.[23]

Another recent example in this district involved the discharge of a deadlocked jury after 10½ hours of deliberations in the re-trial last month of the former Speaker of the Rhode Island House of Representatives. *United States v. Manning,* Crim.No. 80–025.

In response to the United States Attorney's publicized criticism of my declaring a mistrial, the "hold out juror" sent the following letter to the editors of the *Boston Globe* and the *Boston Herald American.*

> I am writing this in response to recent articles in the press questioning Judge Tauro's impartiality in the extortion trial of former Senator James A. Kelly. Two issues have been raised: (1) whether deliberations should have been allowed to continue beyond 13 hours; and (2) whether there is a possible conflict of interest because of Judge Tauro's past dealings with Kelly.
>
> News articles have questioned whether Judge Tauro moved too quickly in ending the deliberations after 13 hours. The implication is that prolonging the deliberations might have resulted in a guilty verdict. As the juror who held out for acquittal, I believe I am the only one in a position to know whether a unanimous verdict was possible, and I would like to state that the length of the deliberations had no bearing on the outcome of the trial. It simply was not proven to me that the defendant was guilty; therefore

---

the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous, *even if your opinion is now in the majority.* But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict. *A jury has the right to fail to agree.*

You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case. *The high burden of proof which must*

*be sustained by the prosecution has not changed.*
*United States v. Angiulo, supra,* 485 F.2d at 40 n. 3 (emphasis in original).

**22.** The United States Attorney's assertion that I declared a mistrial "after a single day's jury deliberation", is a misstatement of fact. Government's Memorandum at p. 24.

**23.** "[A] district court has broad discretion in determining if a mistrial is required by the jurors reaching an impasse ...." *United States v. Hotz,* 620 F.2d 5, 7 (1st Cir. 1980).

I would never have voted guilty just for the sake of unanimity or because of pressure from the other jurors. I would also like to point out that before Judge Tauro declared a mistrial, he sent a note to the jury asking whether we felt we could reach a unanimous verdict with further deliberation. The response from the jury was in the negative, and it was signed by every juror.

Regarding the issue of possible conflict of interest, my only question is why the U. S. Attorney did not raise this issue before the trial. Tauro impressed me as a scrupulously fair and impartial judge.

Patricia H. Ambrose Abington

### E) *Evidentiary Rulings At Trial*

■ In support of his motion, the United States Attorney criticizes certain evidentiary rulings made by me during the course of his trial. It is clear, however, that evidentiary rulings made during the course of trial may not be a basis for a disqualification motion.[24] In any event, arguments pro and con concerning these rulings are covered in the parties' briefs and need no repetition here. I will leave it that I have reviewed each of the challenged rulings and believe them to have been correct as a matter of law.

### F) *Conduct Of The Trial*

As the United States Attorney concedes in his affidavit, there have been "a large number of articles hostile and critical to the government's conduct of this case." Those articles, as well as the trial transcript, demonstrate that I, however, was anything but hostile to either counsel. Indeed, I went to the trouble of praising them both in open court on two occasions for the manner in

which they handled their respective interests.[25]

Perhaps the most objective and enlightening evidence of my attitude toward Assistant United States Attorney Macdonald is demonstrated in an excerpt of the trial transcript dealing with a bench conference that took place on April 10, 1981. The occasion for the conference involved a claim by defense counsel McLaughlin that certain discovery material given him by Assistant United States Attorney Macdonald was incomplete. During that bench conference, Assistant United States Attorney Macdonald twice called Mr. McLaughlin "a fool." That transcript, in relevant part, is quoted below:

MR. MacDONALD: You are a fool.

MR. McLAUGHLIN: That has never appeared in anything like that form in that file that I show you.

MR. MacDONALD: You are a fool.

THE COURT: Is it in here?

MR. MacDONALD: Yes, it is.

THE COURT: Show me where.

. . . . .

The noon recess was taken then in order to give Assistant United States Attorney Macdonald an opportunity to locate the material in question. The transcript resumes:

AFTERNOON SESSION

THE COURT: Counsel, please. (Conference at the bench between Court and counsel as follows:

THE COURT: Found your reference?

MR. MacDONALD: No and yes. I extended an apology to Mr. McLaughlin for my characterizing him as dumb.

. . . . .

---

**24.** "[U]nder section 455(a) the bias to be established must be extrajudicial and not based upon in-court rulings." *In re International Business Machines Corp.*, 618 F.2d 923, 929 (2d Cir. 1980).

Affirming Judge Pesquera's denial of a motion to disqualify him under section 455(a), the First Circuit stated:

But we require more than mere surmise and conjecture; the [moving party] must be able to point to some behavior on the part of the

judge suggesting that there is, in fact, some friction between the judge and the complaining party—not a mere disagreement over the state of the law on any given point. *United States v. Cepeda Penes*, 577 F.2d 754, 758 (1st Cir. 1978).

**25.** Once just after the jury retired to deliberate—and then again after the mistrial was declared.

As I said, your Honor, I was in error in my statement to Mr. McLaughlin at the bench that this appeared in the typed interview reports or prior testimony that had been given to Mr. McLaughlin, and I apologize.

THE COURT: That is up to him, how he treats that.

MR. McLAUGHLIN: I always accept an apology.

. . . . .

MR. MacDONALD: Your Honor, just for the record, I want to apologize to the Court for my behavior before at the bench, and I have a feeling—it's the fifth day of a three-week trial, and I would like to think that my comments to Mr. McLaughlin would not have occurred if I had perhaps not been quite as strung out over this case.

THE COURT: Let me tell you—I told you this before off the record in the presence of Mr. McLaughlin: I like you. I like your style. I think you are a good lawyer. I think that you'd be well advised to channel that great talent you have or harness it just a little bit and make sure that you don't overstep the bounds of propriety.

As far as I am concerned, you owe me no apology. I hold you in nothing but high regard.

MR. McLAUGHLIN: You have no problem with me. I accept the apology on the record.

**26.** *Boston Ledger,* Week of April 30-May 7, 1981 at p. 2, col. 1. See Defendant's Opposition to Motion for Disqualification, Exhibit H.

**27.** *Boston Ledger,* Week of June 26-July 3, 1981, at p. 7, col. 1. See Defendant's Opposition to Motion for Disqualification, Exhibit P.

In this article Mr. Hadden stated:

... About three weeks into the trial, Macdonald replied to a reporter's question after a court session that he thought Judge Tauro was doing "a super job," and went on to say further, without any noticeable irony, that any inability to get in evidence what he wanted were not faults of the judge but failures 'of my own competence.'

. . . . .

... end of conference at the bench.) Transcript of April 10, 1981 at pp. 2–9.

Of significance as well on my attitude, and the manner in which I handled the trial, is Mr. Macdonald's own assessment, as reported in two articles by Douglas Hadden in the weekly newspaper the *Boston Ledger.* In one, Hadden quotes Macdonald as saying I had done "a super job." [26] In the second, Hadden repeats the first quote and adds Macdonald's comment that his failure to get evidence admitted was due to failures "of [Macdonald's] own competence." [27] In neither of Macdonald's affidavits does he deny the accuracy of Hadden's quotes.

■ Of course the issue is not whether or not I did a "super job" in handling this case. Litigants are entitled to a fair trial, not a perfect trial. I have never met a judge who claimed to have presided perfectly over any trial, and I certainly do not make that claim now in this case. But I do maintain that an objective review of the transcripts in this case makes clear that both parties received a fair trial, and that both counsel were treated with respect and courtesy.

G) *Post-Trial Motions*

On May 4, defendant renewed his motion for judgment of acquittal.[28] He also filed a motion to amend the motion for judgment of acquittal in order to add the allegation that the government knowingly used "perjured and false" testimony at trial. Specifically, the motion claims that a key portion of the testimony of the witness Audrey

One would think that Macdonald, particularly, would have shown more gratitude. For nearly the whole first half of the 25-day trial, Tauro had to lead him almost by the hand in order to get his questions in over the estimable objections of defense counsel McLaughlin.

So today Macdonald and Harrington make their case for Tauro's removal, whom they have evidently come to see as the obstacle to Kelly's conviction, and through it to other successful prosecutions in related cases. Their chief objection to Judge Tauro may really be of the nature of the old French proverb that says: 'Men count up the faults of those who keep them waiting.'

**28.** Fed.R.Crim.P. 29(c).

Rawson "was procured as a result of the pressure, suggestions and coercion of the government, in the absence of Mrs. Rawson's attorney."

Defendant requested an evidentiary hearing on the issue of prosecutorial misconduct. He also moved to sequester Audrey Rawson from further contact with either the government or defense counsel, pending the evidentiary hearing. On May 7, without objection by the government, I allowed the motion to amend the motion for judgment of acquittal and the motion to sequester Audrey Rawson.

In an offer of proof filed on May 15, defendant stated that, if granted an evidentiary hearing, he would establish that the United States Attorney knowingly permitted Ms. Rawson to testify falsely at trial that she placed money in a plain white envelope, wrote the defendant's name on the envelope, and then had the envelope delivered to him. The defendant's offer was based primarily on the testimony of Ms. Rawson's lawyer who was called as a witness by the defendant for the purpose of impeaching that testimony by her.[29] In essence, Ms. Rawson's lawyer testified that she told him her testimony in that regard had been suggested to her by the government, and that she had actually had no memory of writing the defendant's name on an envelope and having cash delivered to him.[30]

Following the lawyer's testimony, the government requested and was granted an opportunity to consider calling Ms. Rawson back to the stand in order to rebut his impeaching testimony. After contacting her, however, the prosecutor stated on the record that he would not call her in rebuttal and said: "Contradictions, your Honor, but not such that I would ask the Court to delay the course of the trial."[31]

At a hearing on May 20, I determined that the defendant's proffer of evidence entitled him to the opportunity to prove his allegation that the United States Attorney had knowingly used false testimony at trial. An evidentiary hearing as to defendant's allegation that false testimony was knowingly used by the United States Attorney was scheduled for June 9.

On June 1, the United States Attorney requested a continuance of that evidentiary hearing until June 16 in order to determine whether or not to move for my disqualification because my "impartiality in this matter [had] been questioned in the public media." The United States Attorney was referring to a *Boston Globe* column by David Wilson (Appendix A) that had been published on June 1, the very morning that his motion was filed. The United States Attorney's motion to continue the evidentiary hearing was granted.

The United States Attorney then employed the services of the Federal Bureau of Investigation in an effort to discover any evidence that would demonstrate some past or present relationship between the defendant and me that might reasonably call into question my impartiality in this case.

On June 16, the day the evidentiary hearing concerning alleged prosecutorial misconduct had been scheduled, the United States Attorney filed a motion seeking my disqualification. It is that motion which, of course, is the subject of this memorandum.

### III

### THE FACTS

 The United States Attorney's position is that his motion to disqualify me in this case was "precipitated"[32] by the Boston newspaper columnists whose "informed lay views":[33]

---

**29.** Ms. Rawson had waived her attorney-client privilege during her testimony at trial.

**30.** Transcript of April 27, 1981 at pp. 11–14.

**31.** Transcript of May 20, 1981 Hearing at pp. 24–25.

**32.** Government's Memorandum at p. 31 n. 16.

**33.** *Id.*

... [raised] questions concerning the assigned trial judge's impartiality, making note of an alleged pre-existing relationship between Judge Tauro, when he was legal counsel to Governor Volpe in 1966, and the defendant Kelly, who was then Chairman of a Massachusetts Special Senate Committee investigating allegations of political corruption in the Volpe Administration.[34]

Because of these columnists' suggestions "of a prior relationship between the trial judge and the defendant" the United States Attorney states that he was prompted to undertake "an independent investigation of the suggestions circulated in the public media." [35]

That investigation was conducted by the Federal Bureau of Investigation. The F.B.I. reports of interviews are attached as exhibits in support of the Government's motion to disqualify.[36] Although the defendant challenges the integrity of the F.B.I. interview reports, characterizing them as "sanitized", I am willing to accept them at face value for the purposes of analyzing the United States Attorney's challenge to my impartiality.[37]

As has been noted, the United States Attorney's motion to disqualify relies also on the writings of news columnists, taking the position that "such informed lay views on the question of partiality are suggestive on the problem of appearances." [38] It is appropriate, therefore, that I analyze both the F.B.I. reports and the news columns in evaluating whether the United States Attorney has met the burden of proof imposed on litigants who seek the disqualification of a judge.

A trial judge must hear cases unless some reasonable factual basis to doubt the im-partiality or fairness of the tribunal is shown by some kind of probative evidence.[39]

## A) *The David Wilson Columns*

On the very first page of the Government's Memorandum, the United States Attorney cites a June 1, 1981 column by David Wilson of the *Boston Globe* (Appendix A) in support of his allegation that there was a "relationship" between the defendant and me fifteen years ago that today creates a "natural debt" from me to him.

In that column, Wilson sought to connect the pending evidentiary hearing, alleging misconduct by the United States Attorney, with a Massachusetts Senate Committee investigation, fifteen years ago, of the Volpe administration. That Senate committee was chaired by the defendant Kelly who was then a freshman state Senator. At that time, I was Chief Legal Counsel to then Governor Volpe.[40]

Relying on the wisdom of an unnamed "astute observer, close to the 1966 proceedings", Wilson floats the accusation that Kelly "did a Dixie" on Volpe's behalf in that hearing. In other words, Wilson alleges that Kelly's actions as chairman were improperly influenced by a pro-Volpe bias, rather than the merits of the evidence before the committee. Wilson's undocumented theory goes on to the effect that I was the link between Kelly and Volpe that resulted in this perceived pro-Volpe bias. The implication Wilson then draws from his suppositions is that, for 15 years, I have been harboring a feeling of gratitude toward Kelly, and so cannot be impartial in deter-

---

**34.** *Id.* at p. 1.

**35.** *Id.* at p. 2.

**36.** Government's Motion for Disqualification, Exhibits 1 and 2.

**37.** Defendant's Answer and Opposition to Government's Motion for Reference of Disqualification Matter, at pp. 2–3. Neither the United States Attorney nor Assistant United States Attorney Macdonald dispute in their affidavits defendant's allegation that the F.B.I. reports were "sanitized."

**38.** Government's Memorandum at p. 31 n. 16.

**39.** *Blizard v. Frechette, supra*, 601 F.2d at 1221.

**40.** I served in that position from 1964–68 as a "dollar a year man" and was not a regular state employee.

mining whether or not the United States Attorney used false testimony against him.

Wilson's speculations concerning my attitude toward Kelly have no support in either fact or logic. In the first place, Wilson offers no evidence to substantiate his assertion that I was in some way linked to Kelly during the hearing fifteen years ago. Indeed, he does not even rely on the traditional "unnamed informed source" for his conclusion. All he says is:

> The important thing to remember in all this complex but not quite ancient history is that in the 1966 inquiry, when the Volpe organization communicated its wishes to Chairman Kelly, the communicator, *so far as anybody in Kelly's hearing room could tell*, was Atty. Joseph L. Tauro. Frequent Tauro-Kelly conferences had Democratic members seething. (Emphasis supplied)

Wilson is not the only one who was unable to find anyone who saw or heard a "Tauro-Kelly conference." It is significant to note, as well, that the United States Attorney's own F.B.I. investigation failed to produce any evidence of any link between Kelly and me, either at the time of the Senate hearing or during the past fifteen years.

Not one person interviewed by the F.B.I. said or implied that I had ever even been seen in Kelly's company, let alone that I was the "communicator" between the Volpe administration and then Chairman Kelly. The F.B.I. investigation failed to produce even one person who stated or implied that "Frequent Tauro-Kelly conferences had Democratic members seething."

The reason for the negative F.B.I. report is simple. I was not a "communicator" between the Volpe administration and Kelly. There were no conferences between Kelly and me. Whatever or whoever may have motivated Wilson's column, the F.B.I. report demonstrates clearly that his assertions are contrary to fact.

The facts, corroborated by the F.B.I. investigation, are that, although I was Chief Legal Counsel to the Governor, the Volpe Administration's interests during that committee hearing were ably represented by Atty. Walter McLaughlin, Sr. who was later to be appointed Chief Justice of the Superior Court by former Governor Francis Sargent. As Judge McLaughlin told the F.B.I., he "conducted the whole trial." [41] He represented the Governor's brother S. Peter Volpe, and was assisted by his associate Atty. Arthur Gilman, as well as by Superior Court Judge Joseph S. Mitchell, who was then counsel to then Commissioner of Administration and Finance John McCarthy. I never sat at counsel table. I did observe as many hearings as possible, and conferred with Judge McLaughlin and his associates after each of them.

My overall impression of the committee hearing was that it was nothing more than a political charade conducted and designed to discredit Governor Volpe prior to the forthcoming 1966 election. My impression of fifteen years ago was substantiated in fact by the F.B.I.'s investigation.

One of the persons interviewed by the F.B.I. was Maurice Donahue who, in 1966, was President of the Massachusetts Senate. The F.B.I. interview sought "his recollection of events surrounding the 1966 special Senate committee investigation chaired by Senator James A. Kelly, Jr." In response, Donahue stated that as President of the Senate he appointed all seven members to the special Senate Committee and appointed Senator Kelly as chairman.

Donahue went on to say that "there was no doubt politics played a role in the creation of this committee." He further observed that such investigations were "in vogue" then and that the committee "lasted long enough to do the job." The F.B.I. agent also reports Donahue as saying that "the entire hearing issue could not be separated from politics and that in view of this

---

**41.** Government's Motion for Disqualification, Exhibit 1, F.B.I. Form 302 for interview of Walter McLaughlin, Sr. at p. 2.

he, Donahue, was in favor of the hearings." [42]

Although Kelly was the committee chairman, the chief protagonist was then Senator Beryl Cohen. I had absolutely no contact with either man with respect to any matter before the committee—nor as a matter of fact did I have any social contact with either of them.[43]

As I sat and observed those hearings, I was particularly offended by the fact that Judge McLaughlin was not allowed to cross-examine witnesses presented by the Senate Committee. That type of procedure was alien to me, as my experience had been in the courts where confrontation of witnesses is recognized as a constitutional guarantee.

It is interesting to note that in a later *Boston Globe* column on June 15, 1981, (Appendix B) Wilson stated that Kelly as chairman could "permit or prohibit cross-examination." Assuming that to be so, it is ridiculous to suggest that, if Kelly had a pro-Volpe bias, he would have prohibited cross-examination by Judge McLaughlin. Perhaps more absurd is the suggestion that I, or anyone in the Volpe administration, would feel any gratitude or "natural debt" toward Kelly when he did not even permit Judge McLaughlin to cross-examine.[44]

Because Judge McLaughlin was not allowed to cross-examine witnesses presented by the committee, any questioning of them had to be done by Republican Senators. My memory is that Judge McLaughlin conferred with the Republican Senators at the conclusion of hearings to suggest possible lines of inquiry they might employ during the next hearing. If he did, I may have been present. I also have a memory of conferring with Judge McLaughlin and S. Peter Volpe prior to the latter's testimony before the committee. I did not, however, have any contact, substantive or social, with any Democrat Senator—Senators Kelly and Cohen included.[45]

As the hearings continued, my impression was that the committee would indict the Volpe administration regardless of the evidence presented. That premonition proved well founded. As Wilson acknowledged in

---

**42.** Government's Motion for Disqualification, Exhibit 10, F.B.I. Form 302 for interview of Maurice Donahue at pp. 1–2. In his Memorandum at p. 30, the United States Attorney sees a likeness between the 1966 Kelly committee procedures and those followed by the Ward Commission in 1980. My only comment is to say that the F.B.I. report establishes that the United States Attorney's comparison does a disservice to the efforts of the Ward Commission.

**43.** That this is so is demonstrated by the entire F.B.I. investigation, including the interview with Beryl Cohen. See Government's Motion for Disqualification, Exhibit 2, F.B.I. Form 302 for interview of Beryl Cohen. See also the defendant Kelly's affidavit to that effect. Defendant's Opposition to Motion for Disqualification, Exhibit 2.

**44.** The United States Attorney acknowledges that Kelly "exercised full control over the conduct of the Committee's business." Government's Memorandum at p. 7. See Government's Motion for Disqualification, Exhibits 1 and 2 (the F.B.I. interview reports) for corroboration that Kelly had the power to permit or deny cross-examination.

**45.** My recollection of the events surrounding the 1966 hearing is consistent with and corroborated by the F.B.I. interviews of Judge McLaughlin and each of the other persons interviewed. It is also consistent with my extemporaneous comments made in open court on June 8, 1981:

> I told Mr. Harrington that we were represented—"we" being the administration—by Walter McLaughlin and that I played no role in the defense other than to consult with Mr. McLaughlin at the conclusion of the hearings; but, in any event, I had no contact with Senator Kelly of any substantive nature and, as a matter of fact, had no memory of having any contact with him of any social nature.
> I told Mr. Harrington that the only two occasions that I recall ever seeing Mr. Kelly in the intervening two years was once on my way into a restaurant I said hello to him and he said hello to me, and the second time was during a trip to the Monson School—I think it was for the institutions for the retarded—where he, among other state officials, came to see the conditions that existed at that institution.
> The next time after that that I saw him was when he came into court and we picked a jury in his trial.

*United States v. Meyer*, Crim. No. 80–371–T, Transcript of June 8, 1981 Hearing at pp. 6–7.

his June 1 column, the Senate committee issued a "blistering report", and even went to the trouble of hiring a well-known professional writer to put it together. Heavy artillery for a committee that had "done a Dixie." It is significant to note that the first signature on the committee's report was that of Kelly.[46]

Only someone with a perverted sense of logic could conclude that, for the past 15 years, I have been harboring a feeling of gratitude for that "blistering attack." [47]

A matter of several weeks after the committee's report was issued, the November 1966 election gave the public an opportunity to make a judgment as to the merit of the committee report. As Wilson noted in his June 1 column, the committee's attack "apparently did not affect the outcome. Volpe crushed McCormack by half a million votes."

Since that election fifteen years ago, I have given little if any thought to the 1966 committee hearing or the participation in it of any committee members, including Senators Kelly and Cohen. My memory is that I have seen Kelly twice in the last fifteen years, prior to the start of his trial. Once was when we exchanged greetings as I entered a restaurant. The other was during a tour of an institution for the retarded which Kelly attended along with other state officials.[48]

I have seen Senator Cohen many times since then due to his representation of retarded citizens in well-publicized litigation that has been pending before me. It is of some significance that neither Beryl Cohen, representing the retarded, nor two Massachusetts Attorneys General (Quinn and Bellotti), representing the Commonwealth, have ever even suggested that I should disqualify myself from that litigation because of Cohen's involvement in the 1966 legislative inquiry.

In his June 15 column (Appendix B) Wilson stated:

In fairness, it should be emphasized that no evidence of any improper relationship between the federal judge and the former Senator has surfaced since the history of their association was related in The Globe two weeks ago.

This is a significant retreat from Wilson's June 1 assertion that I had been the backstage "communicator" between Kelly and the Volpe administration.

Later in that column Wilson says that

. . . as Chief Counsel, the governor's lawyer, Tauro certainly was obligated to deal with the chairman. . . Joe Tauro is too competent a lawyer not to have done this in this case.

As the F.B.I. investigation demonstrates, Wilson is correct in his June 15 statement that there is "no evidence of any improper relationship" between Kelly and me. But he is painfully misguided in his sense of legal ethics when he assumes that as a competent lawyer, I was "obligated to deal" with a committee chairman. What Wilson doesn't understand is that competent lawyers don't have to "whisper in the corridors" to get by. Competent lawyers make and throw their own snowballs—and they do so in open court.[49]

---

**46.** See Government's Motion for Disqualification, Exhibit 5.

**47.** The consequences of that "blistering attack" are eloquently demonstrated by the graphic headlines contained in the news clips submitted by the United States Attorney. See Government's Motion for Disqualification, Exhibit 9.

**48.** An affidavit filed by Kelly demonstrates that his memory of these points is essentially the same as mine. See Defendant's Opposition to Motion for Disqualification, Exhibit 2, Affidavit of James A. Kelly, Jr.

**49.** In passing, it is of interest to note that although Wilson covered the 1966 hearings, as well as the State House, he does not pretend to have seen me confer with Kelly.

Also of interest is the fact that Wilson did not cover the Kelly trial and so is in no position to judge the manner in which it was conducted.

It would also be of interest to know why Wilson waited to write his June 1, 1981 column until I was just about to hold a hearing concerning alleged prosecutorial misconduct—nine months after the case had been assigned to me and one month after the trial had concluded. According to the United States Attorney, Wilson declined to respond to any inquiries con-

## B) *The Peter Lucas Columns*

The United States Attorney's "Exhibit A" in support of his motion to disqualify me was a May 20, 1981 column written by Peter Lucas. (Appendix C). That column by Lucas was one of the "informed lay views" that "precipitated this motion to disqualify."[50]

The United States Attorney's position when he filed his motion to disqualify on June 16 was that Lucas, in his May 20 column, agreed with the government's theory that "the influence of pre-existing relationships" prejudiced my conduct of the Kelly trial. That the United States Attorney was wrong in his analysis of the Lucas May 20 column was established by no less an authority than Lucas himself. In a later column written on June 21, 1981,[51] Lucas characterized the United States Attorney's recently filed motion to disqualify me as a "highly personal attack on U.S. District Court Judge Joseph L. Tauro." Lucas then went on to give his "informed view" as to how the Kelly case had been handled by me.

Lucas points out that the United States Attorney's charge "is a curious accusation in view of the fact that the jury voted 11 to one to convict Kelly." Lucas then goes on to say:

> It should be pointed out first of all that the case against Kelly was a weak one from the start, and it was made weaker by McDonald [sic], who showed an astonishing lack of understanding about the basics of state government, like how a state budget makes its way through the legislative process. In addition, McDonald fumbled and mumbled his way through the case and on many occasions Tauro had to help him ask questions of witnesses.
>
> Second, Harrington, who has been around government for some time, and who ran unsuccessfully for attorney general in 1974, was informed by Tauro of his role under Volpe and the 1966 Kelly

hearings before the trial began. Neither Harrington nor McDonald filed a motion of disqualification before the trial began. And even though the prosecution had an advance copy of Tauro's charge to the jury, it made no objection.

> But after Tauro declared a mistrial, Harrington acted as though he were surprised to suddenly learn that Tauro had been chief counsel to Volpe and had been around during the 1966 Senate hearings, as though he were hearing the news for the first time.
>
> It must also be pointed out that Harrington then "dropped a dime" on Tauro; that is, he telephoned at least one Boston political columnist to bring the subject up and imply that he should write about it.
>
> After two Boston columnists did so— although not because Harrington suggested it—he then used these columns as a basis for filing his disqualification motion against Tauro (I was called, but I was going to write what I wrote on May 20 anyway, regardless of Harrington).

As has been noted, Lucas' May 20 column was considered by the United States Attorney to be "an informed lay view" that supported his claim of my partiality toward Kelly.[52] "Not so" responds Lucas in his June 21, 1981 column.

> This was not my interpretation, nor did I write anything of the sort, even though I covered those hearings in 1966 as well as the 1981 Kelly trial. I thought the case against Kelly was so weak that Tauro would throw it out. When he did not, I was convinced, as other reporters who covered the trial were, that Kelly was going to be found innocent.
>
> About Tauro in the May 20 column I wrote: 'There is an opinion among legal people friendly toward Judge Tauro that Tauro should not have sat on the case, and should not sit on it if Kelly is retried.' Some legal people had that opinion and I wrote it.

cerning this matter "upon advice of counsel." Government's Memorandum at p. 2.

**50.** Government's Memorandum at p. 31, n. 16.

**51.** See Appendix D.

**52.** Government's Memorandum at p. 31, n. 16.

But I happen to believe that Tauro did an outstanding job at the Kelly trial, and if the U. S. Attorney's office had a case against Kelly in the first place, they blew it in court.

Lucas, who covered the Kelly trial as well as the 1966 hearings, went on to state with respect to the latter:

> ... Tauro, as chief counsel to Volpe, was a presence during those hearings.

But there is no evidence in the memory of my mind or in Harrington's long motion for disqualification, filed after an FBI investigation, that Kelly and Tauro ever met or talked with one another during that period.

Given the United States Attorney's June 16 characterization of Lucas as an Exhibit A "informed lay view", it is significant that the columnist's memory of what he saw and heard while covering the 1966 hearings corroborates not only my recollection, but also the statements of all witnesses interviewed by the F.B.I., as well as defendant Kelly's affidavit.[53]

In concluding his "informed lay views" as to the merit of the United States Attorney's motion to disqualify me, Lucas' June 21 column observes:

> Some people connected with this case believe that Harrington filed his motion against Tauro to muddy up the hearing into prosecutional misconduct, the hearing into the charge that the U. S. Attorney's office may have knowingly used "perjured and false" testimony. Others believe that it is just sour grapes.

Faced with Lucas' June 21 repudiation of any support for his motion to disqualify me, the United States Attorney recently realigned his sights and zeroed in on Lucas himself.[54] In an affidavit filed on June 30 the United States Attorney abandons his June 16 assessment of Lucas as an "informed lay view on the question of impartiality"[55] and now says he has:

> ... long regarded Lucas as the publicist for particular favored political figures, not including myself. Lucas' coverage of me and my office has, to put it mildly, been less than flattering.[56]

The United States Attorney goes on to characterize two Lucas articles as "slender thread."[57]

The United States Attorney denies "orchestrating" the press to serve his purposes with respect to his motion to disqualify me, and denies that he "contacted" political columnists in an attempt to generate publicity about a "Judge Tauro-Kelly relationship."[58] He does, however, acknowledge discussing the Kelly case with Lucas prior to the latter's May 20 article (Government's Exhibit A).[59] In asserting that he did not specifically "suggest or solicit" an article from Lucas on the alleged Kelly-Tauro relationship, the United States Attorney states:

> I note that Lucas' article of June 21 does not say that I did make a specific request —rather, Lucas uses the phrase "imply" to describe what he thinks I did.[60]

The United States Attorney asserts as well:

> To use Lucas' phrase, I did not "drop a dime" on Judge Tauro, an allegation which it is easy to make and impossible to answer in the forum of newspaper editorializing.[61]

This is an interesting comment coming from a man whose entire case for disqualifi-

---

**53.** Defendant's Opposition to Motion for Disqualification, Exhibit 2.

**54.** See Government's Reply Memorandum and supporting affidavits filed on June 30, 1981.

**55.** Compare Affidavit of Edward F. Harrington June 30, 1981 (Harrington Affidavit) at pp. 7–8 with Government's Memorandum at p. 31, n. 16.

**56.** Harrington Affidavit at pp. 7–8.

**57.** *Id.* at p. 8.

**58.** *Id.* On this general subject, see the June 9, 1981 column written by Charles Pierce, who covered the *Kelly* trial for the weekly paper the *Boston Phoenix*, (Appendix E).

**59.** Harrington Affidavit at p. 7.

**60.** *Id.* at p. 8.

**61.** *Id.*

cation of me, it is now clear, comes down to vague and unsupported speculations contained in one paragraph of Wilson's June 1, 1981 *Boston Globe* column.[62]

## IV

### THE TIMING OF THE UNITED STATES ATTORNEY'S MOTION

In his June 30, 1981 affidavit the United States Attorney cites what he regards as the key lines in Wilson's June 1 column.

> . . . in the 1966 inquiry, when the Volpe organization communicated its wishes to Chairman Kelly, the communicator, so far as anybody in Kelly's hearing room could tell, was Atty. Joseph L. Tauro. Frequent Tauro-Kelly conferences had Democratic members seething.[63]

Harrington stated that "the Wilson article could not be ignored" and that "for this reason alone" he requested an investigation of the Wilson allegation by the F.B.I.[64]

As the United States Attorney acknowledges, I granted a continuance of all matters concerning this case so that the F.B.I. investigation could proceed. According to the United States Attorney, the investigation was completed late in the week of June 8.

As has already been pointed out, no one interviewed by the F.B.I. spoke of seeing or hearing even a single meeting or conference between me and Kelly. No one interviewed characterized me as a "communicator" between the Volpe administration and Kelly. No one interviewed said anything that could even imply that "Frequent Tauro-

Kelly conferences had Democratic members seething." And when I say "no one", I include former Senator Beryl Cohen who, by his own account, and the account of everyone interviewed, was the spark plug and moving force behind that 1966 Senate inquiry.

And so the F.B.I. investigation demonstrated that there was no factual basis for the Wilson column and that, at the least, Wilson had made a serious error. To his credit, Wilson implied as much in his June 15 column, published after the F.B.I. investigation had concluded. He said:

> In fairness, it should be emphasized that no evidence of any improper relationship between the federal judge and the former senator has surfaced since the history of their relationship was related in The Globe two weeks ago.[65]

But, for reasons best known to himself, the United States Attorney went ahead with his motion to disqualify. Undoubtedly recognizing that the reports of F.B.I. interviews contradicted rather than supported any attempt to attack my impartiality, the United States Attorney sandwiched that investigation among literally pounds of news clips and irrelevant memoranda in an effort to shift the thrust of his attack on me, from a "communicator" who had "frequent" conferences with Kelly, to one where my position as Chief Counsel to the Governor, per se, required my disqualification.[66]

But as the United States Attorney's own affidavit demonstrates, he long knew of my

---

**62.** In his affidavit, the United States Attorney states: "Wilson's June 1 bombshell concerning Judge Tauro and Kelly was a surprise to me, and I had no advance warning of or input in that story." Harrington Affidavit at pp. 6–7.

However, Assistant United States Attorney Macdonald states in his affidavit that he did discuss the *Kelly* case with Wilson and that Wilson told Macdonald that "he was going to write something on the *Kelly* case." According to Macdonald's affidavit, his talk with Wilson was on May 28, 1981, four days prior to the publication of Wilson's June 1, 1981 column. Macdonald's affidavit does not say, one way or the other, whether or not he told his superior, the United States Attorney, that Wilson was

going to write a column on the *Kelly* case. See Affidavit of D. Lloyd Macdonald, June 30, 1981 at p. 3.

**63.** Harrington Affidavit at p. 4.

**64.** Harrington Affidavit at p. 5.

**65.** Appendix B.

**66.** It is important to note that the operative facts alleged in this indictment cover the period from November 1970 to September 1976. John Volpe ceased being Governor of Massachusetts as of December 1968.

relationship with Governor Volpe.[67] In the first place, when he was Strike Force leader, I was the United States Attorney. We worked together literally on a daily basis at that time.[68]

As the United States Attorney said in his affidavit:

I have long known that Judge Tauro was at one time legal counsel to Governor Volpe, and in 1980 and early 1981 I was generally aware of a 1966 investigation of the Volpe administration in which Senator Kelly had some part.[69]

Having in mind that the Kelly trial did not even begin until March 19, 1981, other statements of the United States Attorney in his affidavit become significant on the questions of why and when he filed this motion to disqualify.

The Kelly indictment was returned on September 23, 1980. *Before the indictment was returned,* I was generally aware of allegations that former Senator James A. Kelly, Jr. had been involved in a 1966 legislative investigation of the Volpe administration, in which Kelly had supposedly handled the matter in a manner favorable to the Volpe administration. *Prior to the end of 1980,* I was aware of vague and infrequent rumors to the effect that United States District Judge Joseph L. Tauro and Kelly had known each other from their days at the State House.[70]

The United States Attorney goes on to say that these rumors "did not rise to a level of concreteness and specificity which would justify an investigation."

But in the very next paragraph of his affidavit, the United States Attorney concedes that:

In early January 1981, I requested to see Judge Tauro, in order to bring to his attention information relating to the possible existence of a prior relation between himself and a defendant in the case of *United States v. Garfinkle,* Crim. No. 80–371–T.[71]

As I recall it, the "information" the United States Attorney brought to my attention was characterized by him as "street talk." It is paradoxical that a man who had no hesitancy in taking the extraordinary route of questioning *ex parte,* on the basis of "street talk," my participating in the *Garfinkle* case can now maintain that the "Kelly-Tauro rumors" known to him for several months "did not rise to a level of concreteness and specificity which would justify an investigation."[72] The United States Attorney's statement is particularly paradoxical since in fact, as well as in effect, I invited such an inquiry by him during the course of that very meeting he requested with me in early January, more than two months prior to the start of the *Kelly* trial.

My memory as to the substance of what I said to the United States Attorney at that early 1981 meeting was recited by me in open court on June 8, 1981 during a hearing in the *Garfinkle* case:

I told Mr. Harrington then at that meeting, ... that if he had any information about Mr. Kelly and me, that I wish that he would bring it to my attention, but that I wanted him to always do so in open court, that I did not want any ex parte communication the type of which I was then having with him.[73]

The United States Attorney requested a copy of that June 8 transcript and received it on June 10. Nowhere in his June 30, 1981

---

**67.** But note that at page 11 of Government's Memorandum, the United States Attorney incorrectly states that Governor Volpe is my godfather. Whatever motivated the United States Attorney to make that statement, let me make clear for the record that Governor Volpe is not my godfather.

**68.** Harrington Affidavit at p. 1; *United States v. Garfinkle,* Crim. No. 80–371–T, Transcript of January 16, 1981 Hearing at pp. 5–6.

**69.** Harrington Affidavit at p. 6.

**70.** Harrington Affidavit at p. 1 (emphasis supplied).

**71.** *Id.* at p. 2.

**72.** *Id.*

**73.** *United States v. Meyer,* Crim. No. 80–371–T, Transcript of June 8, 1981 Hearing at p. 4.

affidavit does the United States Attorney deny that my statement was made to him in January 1981, nor does he even say he has no memory of it.

On January 16, 1981, a matter of days after my meeting with the United States Attorney, I brought him and defense counsel in the *Garfinkle* case [74] into open court and reiterated my feelings as to the way questions of judicial disqualification should be handled.

THE CLERK: Criminal No. 80–371–T, United States of America v. Paul Garfinkle.

THE COURT: Everybody here?

MR. HOLIAN: Yes, your Honor.

THE COURT: Good morning.

The reason that I am having you in is that several days ago Mr. Harrington came to see me as an officer of the Court and advised me that some information had come to his attention that he thought that I should be aware of to the effect that there was some possibility that perhaps, unbeknownst to me, I knew one of the defendants in this case.

. . . . .

THE COURT: If there is any other information that should be brought to the attention of the Department of Justice or if the Department of Justice has any information that you want to bring to my attention, then please do so.

I have in mind that the mere fact that I know someone is not grounds for me to recuse myself. We have a responsibility to maintain, in quotes, the appearance of justice, and that is an important responsibility; but we also have a responsibility to maintain the integrity of the draw system here, and we are not going to permit anyone in any way to interfere with the integrity of that draw system by suggesting recusals when there is no basis for recusal.

. . . . .

So we just don't pass these cases off lightly merely because we happen to know someone; and I say for the record: of all the people that are probably connected in this case, I probably know Mr. Harrington better than anybody, because, after all, when I was U. S. Attorney he was head of the Strike Force. We used to meet every week.

MR. HARRINGTON: Always treated me well, your Honor.

THE COURT: Thank you. You always treated me well.

. . . . .

I just thought I'd bring you in, clear the air.

I appreciate Mr. Harrington coming in as an officer of the court. I told him what I wanted him to do was to get hold of defense counsel. These things are much better aired in open court. That is the way I like to do things.[75]

And so the very submissions relied on by the United States Attorney in support of his motion to disqualify establish that, at least by January 1981, he knew about my 1966 role as legal counsel to the Governor and Kelly's role in that 1966 legislative hearing. The United States Attorney had every opportunity to suggest, let alone move that I disqualify myself and, indeed, was invited by me to do so two months prior to trial. The only additional information he gained from his June 1981 F.B.I. investigation was to learn that the single paragraph in the Wilson June 1, 1981 column accusing me of being the Volpe-Kelly "communicator"—a paragraph upon which he placed such heavy reliance—was contrary to fact.

The timing of the United States Attorney's motion is, of course, relevant to the issue of whether or not my impartiality is being *reasonably* questioned or whether other motives are involved. Judge Wyzanski put it well in denying a party's motion to disqualify him.

---

**74.** The *Garfinkle* case has been referred to by that name, as well as *Meyer* and *Osserman* who are among the codefendants in the same case.

**75.** *United States v. Garfinkle*, Crim. No. 80–371–T, Transcript of January 16, 1981 Hearing at p. 2 and pp. 4–6.

Moreover, it rather surprises me that a person has any status at the end of the first half of the game to suggest that the referee, who was qualified at the beginning, is disqualified at the middle because in the meantime the player has been cursing the referee outside of court.

*In re Union Leader Corp.*, 292 F.2d 381, 388 (1st Cir.) *cert. denied*, 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961).

 In addition, the question of timing of a motion to disqualify has been ruled controlling as a matter of practice in any number of cases. The law is well settled that one seeking the disqualification of the judge must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification. *United States v. Patrick*, 542 F.2d 381, 390 (7th Cir. 1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977).

Section 455 does not specifically include a timeliness requirement. The Second Circuit recently has held, however, that the timeliness requirements of 28 U.S.C. § 144 [76] are also applicable to section 455. *In re International Business Machines Corp.*, 618 F.2d 923, 932 (2d Cir. 1980). *Cf. United States v. Conforte*, 624 F.2d 869, 880 (9th Cir. 1980) (timeliness cannot be disregarded in all cases involving the delicate matter of disqualification under section 455). *But see SCA Services, Inc. v. Morgan*, 557 F.2d 110, 117 (7th Cir. 1977).

Failure to impose a timeliness requirement on motions brought under section 455 "would authorize disgruntled litigants to bypass the strictures of section 144 by invocation of section 455 far along in a proceeding, after testing the temper of the court." *United States v. International Business Machines Corp.*, 475 F.Supp. 1372, 1377 (S.D.N.Y.1979), *aff'd sub nom. In re International Business Machines Corp.*, 618 F.2d 923 (2d Cir. 1980). The Second Circuit's philosophy

is consistent with the First Circuit's admonition that "a party, knowing of a ground for requesting disqualification, cannot be permitted to wait and decide whether he likes subsequent treatment that he receives." *In re United Shoe Machinery Corp.*, 276 F.2d 77, 79 (1st Cir. 1960). Because it prevents such abuse, "the requirement of timeliness is of fundamental importance." *Id.* at 79.

Another relevant "timeliness" consideration in this case is that what remains to be decided is defendant's multi-faceted motion for judgment of acquittal. As the Second Circuit noted in the IBM case:

A major practical reason for the timeliness requirement is that the granting of a motion to recuse necessarily results in a waste of the judicial resources which have already been invested in the proceeding.

*In re International Business Machines Corp., supra*, 618 F.2d at 933.

V

## WHO MAY HEAR A MOTION TO DISQUALIFY

The government's motion to transfer the motion to disqualify to another judge is without merit and is contrary to the plain wording of the operative statute, as well as overwhelming precedent in this circuit.

Section 455(a) states that a judge *"shall disqualify himself"* (emphasis supplied) should his impartiality be reasonably questioned. That the judge involved should be the first to have the opportunity to weigh the merits of any question concerning impartiality is a firmly entrenched teaching of the First Circuit. The *Mirkin* case and the *Blizard* case, involving Judges Garrity and Caffrey respectively, are but two recent

---

**76.** Section 144 requires motions to disqualify to be filed "not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time." Since the abolition of fixed terms for district courts in 1963, 28 U.S.C. § 138, courts have required litigants to proceed with reasonable diligence in filing a motion and affidavit seeking disqualification of the judge. 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3551 (1975) at 379.

examples. There is no precedent to the contrary.[77]

## CONCLUSION

For the reasons detailed in this memorandum, the United States Attorney's Motion to Disqualify me from determining the remaining issues in this case is denied. An order will issue.

## APPENDIX A

*Boston Globe*, June 1, 1981

A mistrial ... and memories of 15 years ago

### DAVID B. WILSON

*No orthodox Bostonian*
*Is lonely or dejected.*
*For everyone in Boston*
*With everyone's connected.*
*So intricate the pattern.*
*The barroom of the Ritz*
*Becomes a jigsaw puzzle.*
*Each life a piece that fits.*
 —From "Boston is Like No Other Place in the World. Only More So." by E.B. White.

Don't get mad: get even. Reward your friends and punish your enemies. A favor deserves a favor.

This is the Summary of the Law of Massachusetts politics: and violators ignore it at their own risk.

Now Boston is a small town where everybody who is anybody knows everybody else. So dilettantes of politics, their elephantine memories working overtime, watched the extortion trial of former state Sen. James A. Kelly Jr. with more than usual interest.

These dilettantes, who used to be called "political experts" by writers, desperate for a source to cite, find their attention drawn irresistibly to the year 1966, when John A. Volpe was seeking re-election as governor, challenged by former Atty. Gen. Edward J. McCormack Jr.

Atty. Joseph L. Tauro was in the inner circle in that campaign. His father, G. Joseph Tauro, Volpe's one-time lawyer and still close friend, was Chief Justice of the Massachusetts Superior Court, appointed by Volpe in 1962. Later, President Nixon, who owed Volpe a big favor for service in the 1968 campaign, appointed the younger Tauro a judge of the United States District Court.

Now Joe Tauro was, as chief legal counsel, running Volpe's governor's office in April 1966, when what became known as "the architects scandal" broke. Allegations of the payment of political contributions as quid pro quo for design contracts at the new University of Massachusetts Medical School in Worcester were the stuff of an investigation that seemed designed to defeat Volpe.

For the Democrats, state Sen. Beryl W. Cohen (D—Brookline) was point man. From the time the story broke in April, the Republican administration's defensive strategy was overseen by the younger Tauro.

Atty. Walter H. McLaughlin, who succeeded the elder Justice Tauro as chief justice of the state's great trial court, represented the governor's brother, S. Peter Volpe, president of the Volpe Construction

---

**77.** For some other instances in which the trial judge first ruled on a motion to disqualify and was later affirmed by the First Circuit, *see Slotnick v. Garfinkle*, 632 F.2d 163, 167 (1st Cir. 1980); *United States v. Parrilla Bonilla*, 626 F.2d 177, 178 (1st Cir. 1980); *United States v. Martorano*, 620 F.2d 912, 919 (1st Cir.), *cert. denied*, 101 S.Ct. 356, —— U.S. ——, 66 L.Ed.2d 216 (1980); *United States v. Cepeda Penes*, *supra*, 577 F.2d at 757–58; *United States v. Cowden*, *supra*, 545 F.2d at 265.

Judge Wyzanski's unexplained decision to voluntarily request that the then Chief Judge of the Court of Appeals for the First Circuit hear one of the challenges made against him over the years is not precedent to the contrary. *See United States v. Grinnell Corp.*, 384 U.S. 563, 582 n. 13, 86 S.Ct. 1698, 1710 n. 13, 16 L.Ed.2d 778 (1966). Indeed, some of the most thoughtful analysis of the disqualification issue is found in a case in which Judge Wyzanski refused to disqualify himself. *See In re Union Leader Corp.*, *supra*, where Judge Wyzanski denied the motion to disqualify himself from further proceedings in the case, and struck from the record the affidavit submitted in support of the motion.

Co. Peter Volpe was accused by the Democrats of receiving political contributions alleged to have been intended to facilitate preferential treatment when contracts were being handed out.

And presiding as chairman of the Senate committee to investigate all of this was—are you ready for this?—bright, 40-year-old freshman Sen. James A. Kelly Jr. (D—Oxford), an accountant, later to be presented with the strings of the Senate Ways and Means Committee purse.

Kelly, even then, was an old friend of Billy and Frank Masiello, architects, a fact unknown to press and public at the time. Billy Masiello was the immunized key witness against Kelly in the current proceeding.

The important thing to remember in all this complex but not quite ancient history is that in the 1966 inquiry, when the Volpe organization communicated its wishes to Chairman Kelly, the communicator, so far as anybody in Kelly's hearing room could tell, was Atty. Joseph L. Tauro. Frequent Tauro-Kelly conferences had Democratic members seething.

Kelly, imperturbable, maintained he had a duty to be impartial and to prevent the proceedings from turning into a partisan witchhunt. He is a very plausible man.

The committee's blistering report was written by Richard Goodwin, leaked to the press by the Democrats and turned over to then-Atty. Gen. Edward W. Brooke a month before the election. It apparently did not affect the outcome. Volpe crushed McCormack by half a million votes.

Members of the committee recall, however, that Chairman Kelly had wanted to withhold the report until after the election. One astute observer, close to the 1966 proceedings, insists that Kelly "did a Dixie" on Volpe's behalf.

Later, to the surprise of none of the principals, Brooke, having been elected to the U.S. Senate, found no grounds for proceeding against the targets of the inquiry.

Almost 15 years later, some of the "political experts" relished the spectacle when the younger Tauro, as a justice of the U.S. District Court, did not step aside and let another judge preside over the trial of Jimmy Kelly.

After a 25-day trial and only 11 hours of deliberation by the jury, Justice Tauro allowed a motion for mistrial. The mistrial was declared soon after announcement in open court that the jurors were "hopelessly" deadlocked, 11–1, for conviction.

To cynics, this seemed precipitate. Jimmy Kelly went to the Harvard Club to get some steam.

Judge Tauro sees no impropriety, says he can remember seeing Kelly only twice since 1966 and that he never has had a private conversation with the defendant.

"To say that a judge should disqualify himself in 1981 because of something that happened 15 years ago when he was chief counsel to a governor just doesn't make any sense," he said in a telephone interview Friday.

He emphasized that the case was assigned to him on a blind-draw basis and that any attempt to tamper with the system, designed to assure that judges get cases at random, amounts to "an obstruction of justice." Neither side in the Kelly case asked him to withdraw, he pointed out.

"If there is the slightest question of my impartiality in a case, I don't want to sit on it," he said. "I wouldn't be worth my salt if I listened to whispers in the corridor."

On June 9, Judge Tauro will hold an evidentiary hearing on a motion for acquittal to dismiss all charges brought against Kelly. Connoisseurs of Massachusetts politics can hardly contain their excitement.

For this is Boston, where people have long memories and chuckle a lot.

*David B. Wilson is a Globe columnist.*

## APPENDIX B

*Boston Globe*, June 15, 1981

The Tauro impartiality doubts remain

### DAVID B. WILSON

In a remarkable *obiter dictum*, delivered in the course of an unrelated case, US Dis-

trict Judge Joseph L. Tauro last week undertook to refute critics who question his judgment in presiding over the extortion trial of former Sen. James A. Kelly Jr.

Judge Tauro says he has never had a private conversation with Kelly, and only saw him twice between 1966 and the day the trial began.

The judge also takes the position that in the 1966 "architects scandal" hearings on Beacon Hill he functioned as an observer, and remembers no contact with Kelly, then chairman of a politically loaded inquiry aimed at blocking the re-election of Gov. John A. Volpe, to whom Tauro was chief counsel.

In fairness, it should be emphasized that no evidence of any improper relationship between the federal judge and the former senator has surfaced since the history of their association was related in The Globe two weeks ago.

On the other hand, the judge seems overly modest in recalling his role in the 1966 inquiry. There is considerable evidence that Tauro was the captain of the Republican administration's defense team, exercising overall responsibility for tactics and strategy in the cut-and-thrust duel with the Democrats, led by Sen. Beryl W. Cohen.

At this distance in time, a rehash of details would be tedious and irrelevant. What is relevant is the belief, then and now, on the part of most of Kelly's fellow Democrats, that the chairman, who had defected from party ranks to back Volpe's sales tax drive, was a covert ally of the Volpe forces throughout the six-week proceeding.

William P. McDermott, who was Volpe's appointments secretary, sheds light on Tauro's role in this sensational investigation. He says that at the outset he asked what he might do to help.

"Forget about it," he remembers being told. "Let Joe handle it."

"I was told to keep my nose out of it," he said last week.

Another senior Volpe aide, who asked not to be identified, said last week that Tauro, reporting directly to the governor, was in full charge of the Volpe defense against what Tauro and others have described as a "hatchet job" and a "political charade."

Photographs on file at The Globe show Tauro huddling with Atty. Joseph Mitchell, minority counsel, Senate Republican Leader John F. Parker, Volpe Press Secretary Barry Locke and the late Sen. Leslie B. Cutler. One has Tauro at the witness table with the governor's brother, Peter, and his counsel, Atty. Walter H. McLaughlin. The hearing has just recessed. Tauro is looking directly at the chair.

David W. Shields, an architect, testified he gave Peter Volpe a $1000 check in hopes of getting favorable consideration for design contract awards. It was Tauro who volunteered that Shields might have confused Peter with another Volpe brother, Patrick. And, the record shows, when Peter arrived to testify in a blaze of television lights, he was flanked by Tauro and McLaughlin.

None of which, of course, proves Tauro to have had any intimacy with the ambitious young senator who was later to be tried before Tauro on charges he extorted $34,500 from architects seeking design contracts.

But as chairman of the 1966 inquiry, Kelly was in a position to schedule, rule, permit or prohibit cross-examination, issue public statements, release reports and generally guide the course of the hearings.

And as chief counsel, the governor's lawyer, Tauro certainly was obligated to deal with the chairman, directly or through intermediaries, and, most important, to furnish his client in the corner office with his personal evaluation of Kelly's probity, flexibility, honesty, integrity, approachability and, generally, character.

Joe Tauro is too competent a lawyer not to have done this in this case. That he had to do so does not imply any improper commerce on his part. He just had to be there, doing his job. He was, and he did.

Judge Tauro argues that this relationship is insufficient to create grounds for questioning his impartiality in the Kelly case presently before him. The critics disagree.

*David B. Wilson is a Globe columnist.*

## APPENDIX C

*Boston Herald American*, May 20, 1981

### On Politics/People talking about Harrington and Dwight

One day you're a hero and the next day you're a bum. That's the way it goes in this business. One day they believe you and you are an important man. The next day you're nobody.

Such is the case with Billy Masiello, the self-admitted perjurer and corruptor, who was the star witness before the Ward Commission last summer when he told how he paid to win architectural design contracts for his firm, Masiello Associates, Architects, of Worcester.

He also testified that he paid then-Lt. Gov. Donald R. Dwight $2,000 in cash on election day in 1974 in Dwight's office. Other testimony concerning Dwight dealt with his role in awarding state contracts to favored people when he was lieutenant governor.

The Ward Commission turned the Dwight case over to Attorney General Francis X. Bellotti who referred it to U. S. Attorney Edward F. Harrington, even though Harrington's office had been investigating Dwight all along.

Dwight, who is now the publisher of the Minneapolis Star and Tribune, refused to testify before the Ward Commission.

At any rate, in a curious development, Harrington last week cleared Dwight of any wrongdoing, issuing a public statement to the effect that he was doing it publicly because of the "extensive publicity" the case had received.

Now, Billy Masiello was the chief witness in the trial of former Sen. James A. Kelly that ended up in a hung jury. Kelly had been accused of extorting $34,500 from the Masiello firm and Masiello, given immunity from prosecution, testified against him, albeit reluctantly.

He was a believable government witness in the Kelly case, or so the government believed, but he is not a believable witness in the Dwight case. Curious. Particularly so when he took and passed a lie detector test on his Dwight testimony to the U. S. Attorney's office.

Dwight speaking from his Minnesota haven, said of Masiello's testimony before the Ward Commission last summer that it was "an absolute lie by a professional liar. I never met the man."

Masiello, upon learning that Dwight had been cleared by Harrington, said: "I took a lie detector test and passed it. Why doesn't he?"

It is a strange case that has people talking. Harrington could have cleared Dwight long ago, but did not. The alleged taking of money by Dwight took place in November, 1974. The federal statute of limitations ran out in November 1979. That's when Dwight and his attorney, Thomas D. Burns, should have celebrated. Perhaps they did. But why the delay?

If Harrington cleared Dwight before the Kelly trial, Masiello's credibility as a government witness against Kelly—whatever was left of it—, would have been seriously damaged. Dwight was held hostage by Harrington until the Kelly trial was completed.

Even though Harrington has said he will seek to try Kelly again, he will not be around to do it, because he will be replaced by a Republican this summer.

John William Ward, the chairman of the defunct Ward Commission, said he was "puzzled" by Harrington's decision and announcement on Dwight.

"I was puzzled he chose to announce he was not going to do something," Ward said, adding there was testimony before his commission that "contracts were walked past Dwight."

Harrington, in his two paragraph statement, cited the "extensive publicity" given the Dwight case as a reason for his making

a public announcement. But there has been no publicity on Dwight for almost a year.

Harrington, as befits a U.S. Attorney, has refused to comment publicly on the Dwight case beyond his two-paragraph statement.

But he did fly off the handle when his application for a Superior Court judgeship was brought up by a reporter. Burns, Dwight's attorney, is a member of the Judicial Nominating Committee, which nominated Harrington for a judgeship, and it is common knowledge in legal circles that Burns lobbied for Harrington.

Harrington, still smarting over the hung jury in the Kelly case—where one juror held out and refused to vote for a conviction—is privately blaming U. S. District Court Judge Joseph L. Tauro for Kelly getting off.

There is an opinion among legal people, many of whom are friendly toward Judge Tauro, that Tauro should not have sat on the case, and should not sit on it if Kelly is retired.

Tauro was legal counsel to former Gov. John A. Volpe when Kelly was chairman of a legislative committee that investigated the awarding of architectural contracts by the Volpe Administration in 1966. Tauro knew Kelly. State House observers believed that Kelly went in the tank to Volpe on that investigation.

But, to Tauro's credit, he displayed a deep knowledge of the workings of state government during the Kelly trial, a far deeper knowledge of it than either the prosecution or the defense counsel did.

Dwight, at any rate, is home free now, up in Minnesota, publishing his newspapers. They are supposed to be pretty good newspapers, but I'll never work there.

*Peter Lucas' column appears Sunday, Wednesday and Friday.*

## APPENDIX D

*Boston Herald American*, June 21, 1981

On Politics/'Bang' beginning to sound
 like a whimper?

Outgoing U. S. Attorney Edward F. Harrington, in his highly personal attack on U. S. District Judge Joseph L. Tauro, coming after his office failed to win a conviction in the extortion trial of former state Sen. James A. Kelly, has raised a lot of serious questions.

In addition to attacking Judge Tauro, Harrington also splattered mud over such distinguished public figures as former Supreme Judicial Court Chief Justice G. Joseph Tauro, father of District Court Judge Tauro, former Superior Court Chief Justice Walter McLaughlin, and former Gov. John A. Volpe.

Judge Tauro declared a mistrial in the Kelly trial April 29 after the jury failed to come up with a verdict after eight hours of deliberation. Kelly, on trial for 25 days, had been accused of extorting $34,500 from Masiello Associates, Architects, of Worcester, when he was chairman of the Senate Ways and Means Committee.

Subsequently, Attorney George A. McLaughlin, Kelly's lawyer, filed a motion for acquittal on the grounds that Assistant U. S. Attorney D. Lloyd McDonald, who tried the Kelly case for the prosecution, had used "perjured and false" testimony, and what he used "pressure suggestions and coercion" on Audrey Rawson, who worked for Masiello Associates, to elicit testimony that she had put Kelly's name on envelopes containing money destined for Kelly.

Tauro announced that he would hold an evidentiary hearing on the McLaughlin motion at which McDonald, the prosecutor, would be a witness, were Tauro to rule in McLaughlin's favor, Kelly, who faces retrial, could have been acquitted.

Harrington, meanwhile, announced that he was considering filing a motion for Tauro's disqualification on the grounds that Tauro's "impartiality in this matter has been questioned in the media." That motion was filed last Tuesday.

And it all goes back to 1966 when Tauro was chief counsel to then Gov. Volpe and Kelly was chairman of a Senate committee that investigated the awarding of architec-

 tural contracts in the Volpe administration, and the role Tauro played in those hearings.

Harrington, among other things, charged in his motion for Tauro's disqualification, that Tauro owed a "natural debt" to Kelly stemming from those 1966 hearings, and was biased in Kelly's behalf during Kelly's trial and in Tauro's charge to the jury.

This is a curious accusation in view of the fact that the jury voted 11 to one to convict Kelly.

It should be pointed out first of all that the case against Kelly was a weak one from the start, and it was made weaker by McDonald, who showed an astonishing lack of understanding about the basics of state government, like how a state budget makes its way through the legislative process. In addition, McDonald fumbled and mumbled his way through the case and on many occasions Tauro had to help him ask questions of witnesses.

Second, Harrington, who has been around government for some time, and who ran unsuccessfully for attorney general in 1974, was informed by Tauro of his role under Volpe and the 1966 Kelly hearings before the trial began. Neither Harrington nor McDonald filed a motion of disqualification before the trial began. And even though the prosecution had an advance copy of Tauro's charge to the jury, it made no objection.

But after Tauro declared a mistrial, Harrington acted as though he were surprised to suddenly learn that Tauro had been chief counsel to Volpe and had been around during the 1966 Senate hearings, as though he were hearing the news for the first time.

It must also be pointed out that Harrington then "dropped a dime" on Tauro; that is, he telephoned at least one Boston political columnist to bring the subject up and imply that he should write about it.

After two Boston columnists did so—although not because Harrington suggested it—he then used these columns as a basis for filing his disqualification motion against Tauro (I was called, but I was going to write what I wrote on May 20 anyway, regardless of Harrington).

In a footnote in Harrington's 35-page motion for disqualification, he said: "Certainly the two newspaper columnists whose articles precipitated this motion to disqualify found this interpretation of the influence of the pre-existing relationships upon the judge's conduct of the trial reasonable."

The "interpretation" Harrington was talking about concerned this paragraph in Harrington's motion: "Under the circumstances it is perhaps not unreasonable to expect that Judge Tauro would assume the trial stance he did in the first Kelly trial: that he would restrict the Government's evidence as to political corruption, denigrate the Government's case and the credibility of its two major witnesses and finally bring the first trial to a rapid conclusion when it appeared that 11 of the 12 jurors were prepared to reach a conclusion different from the one he had reached."

This was not my interpretation, nor did I write anything of the sort, even though I covered those hearings in 1966 as well as the 1981 Kelly trial. I thought the case against Kelly was so weak that Tauro would throw it out. When he did not, I was convinced, as other reporters who covered the trial were, that Kelly was going to be found innocent.

About Tauro in the May 20 column I wrote: "There is an opinion among legal people friendly toward Judge Tauro that Tauro should not have sat on the case, and should not sit on it if Kelly is retried." Some legal people had that opinion and I wrote it.

But I happen to believe that Tauro did an outstanding job at the Kelly trial, and if the U. S. Attorney's office had a case against Kelly in the first place, they blew it in court.

When Kelly chaired that 1966 probe into the Volpe Administration, there was no doubt that Kelly went into the Tank to Volpe, and he did his best to sabotage those hearings and help Volpe. Tauro, as chief counsel to Volpe, was a presence during those hearings.

But there is no evidence in the memory of my mind or in Harrington's long motion for disqualification, filed after an FBI investigation, that Kelly and Tauro ever met or talked with one another during that period.

Some people connected with this case believe that Harrington filed his motion against Tauro to muddy up the hearing into prosecutional misconduct, the hearing into the charge that the U. S. Attorney's office may have knowingly used "perjured and false" testimony. Others believe that it is just sour grapes.

Harrington, who is shortly to be replaced by a Republican, expected to go out of office with a bang with the Kelly conviction, and perhaps become the Superior Court judge he wanted to become. But he failed to convict Kelly. Gov. Edward J. King gave the judgeship to someone else. He must now face a hearing on the manner in which he directed the prosecution of Kelly, and he will be out of a job in a couple of weeks.

He is leaving office with a bang, but it may not be quite the noise he expected.

*Peter Lucas' column appears Sunday, Wednesday and Friday.*

## APPENDIX E
*Boston Phoenix*, June 9, 1981

*Out on maneuvers: Harrington tries to move Tauro out of the Kelly case*

by Charles P. Pierce

When the extortion trial of former state Senator James A. Kelly Jr. ended in a mistrial, on April 30, hardly anyone involved was pleased. With the jury deadlocked at 11–1 to convict him, Kelly knew that he was a lot closer to a trip upriver than he'd anticipated. U.S. Attorney Edward F. Harrington, on the other hand, was furious at Judge Joseph Tauro for declaring a mistrial after the jury had deliberated only 11 hours.

Perhaps the only people even marginally happy with the situation were the reporters who had listened to the case for some 25 days. Of course, they had been denied a definitive conclusion, but there were compensations. After all, you can cover politics and the law for a long time before you hear a US attorney refer loudly to a sitting federal judge as a "fucking prick" in the corridors of a federal courthouse.

Harrington's impolitic explosion last April was the emotional equivalent of the maneuverings he began last week in Tauro's court. Harrington asked that a scheduled June 9 hearing into a defense motion to acquit Kelly be postponed until June 16, claiming he needed the delay in order to prepare a motion of his own. That motion would ask for "disqualification of the trial judge whose impartiality ... has been questioned in the public media." Like many elements of the government's oft-comic pursuit of Kelly, this latest move is touched with no little absurdity.

The flap concerns 1966 legislative hearings into charges of contract-selling within the administration of Governor John Volpe. Kelly, then a freshman senator, chaired the investigations committee. Tauro was Volpe's chief counsel. It is alleged that Kelly agreed to withhold the committee's report until after that year's gubernatorial election, so as not to damage Volpe's campaign. (It should be noted that the strategy apparently didn't work. Committee Democrats leaked the report, Volpe won big anyway, and no prosecutions were forthcoming.)

Harrington's motion came on the heels of a column by David Wilson in the June 1 *Globe*. In his column, Wilson discussed the 1966 hearings, painted Tauro as Volpe's liaison with Kelly's committee, and implied that Tauro's handling of Kelly's case was a form of returning the favor. "Reward your friends and punish your enemies," read Wilson's lead. "A favor deserves a favor."

Both dailies jumped on the issue. The *Herald* noted that its own Peter Lucas had raised similar questions on May 20, and that Lucas's column must have been the one that perked up Harrington's ears. The *Globe*, on the other hand, said that Harrington "was apparently referring" to Wilson's column.

Harrington, who refused to comment on his motion, must have loved watching the dailies scramble. It so obviously suited his purpose, that purpose being to put enough public heat on Tauro that the judge will feel obligated to remove himself from the case. Given the choice, Harrington would rather try this case before Torquemada than Joseph Tauro. Cynical types have already begun to point out that the Wilson column was immediately followed up by a motion based largely on its contents and proposed by a US attorney who has had a career of playing the press like eight kinds of violin. "I think he's afraid of losing that second trial," said one State House veteran. "Above all, he doesn't want another trial before Tauro."

Harrington has very good reason to feel this way. Tauro continually riddled Assistant US Attorney D. Lloyd Macdonald during the first trial, often with extraordinarily blunt reprimands. The question now turns on Tauro's motivation. There are clearly more compelling reasons for the judge's behavior than some 15-year-old State House dealings.

In brief, the case that the US brought against James Kelly was a botched hodgepodge. That the government came so close to winning owes more to the presumption of guilt against indicted politicians than to any sort of prosecutorial expertise. All the crucial witnesses appeared under grants of immunity. The case was vitally dependent upon the testimony of noted fixers William and Frank Masiello, from whom Kelly is alleged to have extorted money. Both men have told so many stories so often that they are walking examples of reasonable doubt.

Further, Macdonald's performance was a debacle. He often got so tangled up in himself that Tauro took the opportunity to ask the prosecutor's questions for him, which rings somewhat ironic in the light of Harrington's recent motion.

And Tauro has a reputation among lawyers as being a "defendant's judge," a reputation he developed long before Kelly appeared before him. "Prosecutors," one source familiar with the judge said, "hate the guy."

In the course of the trial, the prosecutors were most clearly displeased with Tauro's frequent reprimanding of Macdonald, his charge to the jury (which said, in essence, that convicting Kelly required that the jurors believe both *les freres* Masiello, and his declaration of a mistrial. Comes now the US attorney to attribute a motive to these actions.

Harrington's motion resembles nothing more than a ploy typical of a desperate defense attorney. When your case is hit below the waterline, fire a broadside at the judge. There is little indication that Harrington will be any more successful at it than his brothers in court have been in the past. "Tauro will not take himself out," opined a prominent attorney familiar with such cases. "That's indicated by the way he's going to handle it. He's not going to soft-pedal it; he's going to hear it in open court. He's not going to have his name sullied in open court, or in the *Boston Globe*. Harrington's going to have to come up with chapter and verse. What's he going to do? Introduce Wilson's column?"

Moreover, in this state, if all judges who had at one time crossed paths with pols involved in cases before them disqualified themselves, half the benches in the Commonwealth would be empty. Take, for example, Tauro's colleague on the federal bench, Walter Jay Skinner.

Skinner was counsel to the legislature's crime commission in 1962. Later, Governor Francis Sargent twice nominated him to the state bench, only to have the Executive Council veto the idea. While serving with the crime commission, Skinner had helped pursue (or persecute, depending on how deeply your ox had been gored) friends of said executive councilors. This rejection, in fact, made Skinner available for a federal judgeship. In that capacity, Skinner presided over the 1977 extortion trial of state Senators Joseph DiCarlo and Ronald McKenzie. Does this mean that Skinner was repaying Frank Sargent when he rebuffed efforts by the two senators to explore whether the MBM affair went beyond them

(as we now know it did), to top figures within the Sargent administration (as we now know it did)? "Where was Harrington then?" asked a prominent defense attorney.

Even Harrington's stated rationale for asking Tauro to bail out is badly flawed. The motion clearly implies that the recent speculation was the catalyst, and that Harrington's doubts concerning Tauro's impartiality have been prompted by "revelations" in the media. This is utter hogwash.

Is it plausible to believe that Harrington conducted one of the most significant probes into political corruption in the history of the Commonwealth, spent three years and countless public moneys to bring Kelly to trial, and didn't know until last week that his defendant and the presiding judge had at one time had political dealings? If it is plausible, then Harrington either has a lousy memory or is a damned poor excuse for a prosecutor.

If it is not plausible, and if Harrington knew all along that Kelly and Tauro had had such dealings, then he clearly overrated his case and his prosecutor if he thought those dealings might not matter. Because for all the bitching that's come out of the US attorney's office about how Tauro handled the trial, none has dealt with the central issue: that, assuming the wildest conspiracy story is true and Tauro was inclined to give Kelly every break possible, the raggedy nature of the case, as well as Macdonald's fumblemouth, gave the judge every opportunity to do so.

Harrington's status as lame duck has given rise to speculation that this motion may just be one final volley before he retires. He clearly realizes that the scorecards of the various prosecutors in the great corruption sweepstakes launched by the MBM affair are not impressive. Kelly's is the only major scalp left, particularly now that Harrington has given up his pursuit of former Lieutenant Governor Donald Dwight, now a newspaper publisher in Minneapolis. Bill Masiello told the Ward Commission that he had paid Dwight off in the State House. Dwight now says that he is glad that Harrington has absolved him of charges brought by a "confirmed liar," the same confirmed liar whose dubious probity is central to the case against James Kelly. To lose Kelly is to lose, effectively, the whole ballgame.

Shakespeare reminded us that nothing holds fashion save war and lechery, although he would have tacked politics onto the list if he had written in Massachusetts. Everything is political, including, at bottom, Edward Harrington's motion; it is the judicial equivalent of jockeying a bill between legislative committees in order to bring it before a more sympathetic chairman. For Harrington to pretend otherwise is at best duplicitous.

For him to pretend otherwise is for him to ask us to accept him, the FBI, and several other investigatory apparatuses as underdogs. It is for him to ask us to believe that this whole affair came to his attention only last week, difficult to accept from someone who has always cultivated his contacts throughout Massachusetts politics. And it is for him to ask us to believe that his case was unfairly assailed by a judge who has waited patiently for 15 years to pay off a relatively minor debt.

There ought to be a statute of limitations on this sort of thing.