UNITED STATES of America, Plaintiff,

v.

James A. KELLY, Jr., Defendant.

No. CR 80–316–T.

United States District Court,
D. Massachusetts.

July 26, 1982.

Mark L. Wolf, Acting U. S. Atty., Amos Hugh Scott, Asst. U. S. Atty., Boston, Mass., for U. S.

George A. McLaughlin, John S. Leonard, McLaughlin Brothers, Boston, Mass., for defendant.

## MEMORANDUM

TAURO, District Judge.

The defendant (Kelly), a former Massachusetts state senator, has accused the government of serious misconduct during the trial of this one-count extortion indictment.[1] Specifically, he has accused the government of an "egregious pattern of misconduct, including . . . the intentional engendering and solicitation of, reliance upon, and failure to correct false testimony at trial."[2] The prime target of Kelly's accusation is former Assistant U. S. Attorney Lloyd Macdonald (Macdonald), who tried the case for the government.[3]

The six-week trial ended on April 29, 1981 in a mistrial, after the jurors reported five times that they were hopelessly deadlocked. Shortly thereafter, Kelly filed this motion. An evidentiary hearing on the motion was scheduled for June 9, 1981. On June 1, the government requested a continuance of that evidentiary hearing. A week later, on June 16, then-United States Attorney Edward F. Harrington moved to disqualify the court from further participation in the case. That motion was denied on July 9, 1981.[4] Thereafter, the United States Attorney petitioned the First Circuit Court of Appeals for a writ of mandamus prohibiting the court from further participation in the case. That petition was denied by the Court of Appeals on December 7, 1981.[5]

The long-postponed evidentiary hearing on this motion was held on February 23 and 24, 1982. The record of that hearing includes the trial transcript, various government investigation reports, as well as the live testimony of Macdonald, Audrey Rawson (Rawson), who had been a key government witness, and Arnold W. Olsson (Olsson), who had been Rawson's lawyer, and who was also a witness at trial. Final briefings and arguments were concluded on May 25, 1982, and the matter was then taken under advisement.

## I

### The Facts

In order to put the testimony received at the evidentiary hearing in perspective, it is necessary to outline the factual pattern that emerged at trial. The government's theory of proof was to the effect that the defendant received cash from William Masiello in return for using his position as a state senator to influence the award of state design contracts to Masiello's architectural firm. The question of whether any cash payments were made to Kelly was a hotly contested matter. Masiello and Rawson were the government's key witnesses on this issue. Kelly took the stand and denied receiving any payments.

During the fall of 1979, Masiello received a grant of immunity from the government.

1. Specifically, the defendant is charged with violating the Hobbs Act, 18 U.S.C. Sec. 1951.

2. Defendant's Memorandum in Support of Motion for Judgment of Acquittal, p. 1.

3. Defendant charges similar misconduct by F.B.I. Agent James Ring. No evidence was brought to the attention of the court that would warrant a finding of misconduct by Agent Ring.

4. *U. S. v. Kelly*, 519 F.Supp. 1029, 1031 (D.Mass.1981).

5. *In re United States*, 666 F.2d 690, 698 (1st Cir. 1981).

Thereafter, he testified on several occasions before the United States Grand Jury, as well as the Massachusetts Special Commission[6] which was investigating the award and performance of state building contracts. The thrust of Masiello's inculpatory testimony before the Grand Jury and at trial was that, except for one occasion in February 1973, he made each of the alleged cash payments to Kelly personally with no one else present. The February 1973 occasion involved a telephone request by Masiello to Rawson, then his secretary, asking her to cash a check and send a sum of money to Kelly at his Boston office. Masiello testified that, except for that February 1973 occasion, no employee of his firm sent envelopes with cash from him to Kelly.

The dates of payment were crucial with respect to a statute of limitations issue. The government had the burden of proving that at least one payment was made after September 23, 1975, five years prior to the return of the indictment. Masiello's recollection of the dates of alleged payment were "indistinct" and "imprecise in general."[7] Indeed, at trial Masiello's credibility was subject to scathing attack. Among other things, he admitted to having committed perjury on several prior occasions, as well as having engaged in a pattern of corruption and kickbacks in the course of his work on state contracts.

Rawson had been Masiello's secretary throughout the relevant period. During the investigation of the case, she was interviewed on a number of occasions by both federal and state investigators. She was aware that the investigators were seeking to determine whether cash payments had been made by Masiello to Kelly. During the investigation, she retained Olsson and conferred with him often. At trial, she testified that she told Olsson everything she knew about the Masiello-Kelly relationship, recognizing that it was important for her to do so in order to receive sound legal advice. On each of the many occasions she was interviewed by state and federal investigators prior to August 13, 1980, Olsson was with her. At each of those interviews prior to August 13, 1980, Rawson denied any knowledge of any cash being given to Kelly. Her consistent testimony had been that she had placed money in envelopes for delivery to Masiello who was to pick up the money at Kelly's office from his secretary.

On August 13, 1980, Rawson changed her story during a meeting she had alone with Macdonald. Olsson did not accompany her on that day, and no other government official was present. On that date she told Macdonald, and later the grand jury, that she had, on several occasions, put money in an envelope, written Kelly's name on the envelope and then sent it to him at his Boston office. This was the thrust, as well, of her testimony at trial. And at trial, she testified that, prior to August 13, 1980, she had told her lawyer, Olsson, that she had sent money to Kelly in envelopes with his name on them.

Macdonald had been an assistant district attorney from 1974 to 1978 and, thereafter, became an Assistant United States Attorney. He was the Assistant in charge of the Masiello-Kelly investigation, and prosecuted the indictment at trial. He was intimately familiar with the details of the entire investigation, including the vulnerability of Masiello's credibility. He considered Masiello to be a key witness and knew that a prima facie case could not be made against Kelly without Masiello, particularly with respect to the statute of limitations issue.

Macdonald knew that, prior to August 13, 1980, Rawson had consistently stated that she had sent cash to Masiello not Kelly, and that she had never stated that she had participated in any payment to Kelly. Macdonald was aware that Rawson's changed story, to the effect that she had in fact sent cash in envelopes to Kelly, was material testimony that would help the government's case at trial.

Macdonald also knew that Masiello's version of the cash payments, *i.e.*, only he gave

---

**6.** The Commission is often identified as The Ward Commission.

**7.** Government's Mandamus Brief at p. 64.

money to Kelly, did not corroborate Rawson's changed story to the effect that she had sent cash to Kelly on several occasions. Macdonald recognized that Masiello's testimony on the issue of cash payments to Kelly was significant and material evidence. Macdonald believed that Masiello's version of the events was inaccurate. On that point, George MacLaughlin (MacLaughlin), counsel for Kelly, questioned Macdonald as follows at the evidentiary hearing: [8]

Q. Was the question and Masiello's answer the truth as you understood it?

A. No.

Q. No. So you mean to say that during this trial you asked William Masiello the question—who was your witness—the question: "Other than this occasion, Mr. Masiello, how were the cash payments to Senator Kelly handled?" and he answered the way I have just put in the record in substance or exactly: "I cashed a check made out to me and forwarded the money to Senator Kelly"; and you sat there as United States Attorney and you knew that wasn't true and you didn't bring it to my attention and you didn't bring it to Judge Tauro's attention; is that what you are saying?

A. That's what I'm saying.

MacLaughlin later interrogated Macdonald as follows: [9]

Q. You believed he was testifying incorrectly on the point, is that correct?

A. Yes.

Q. If incorrectly equals falsely, you will agree he was testifying falsely on the point?

A. Yes.

Q. However, you felt that you were entitled to put this evidence into the record without bringing it to the attention of myself or Judge Tauro because you formed the opinion that, although Masiello was giving inaccurate testimony, which you knew was inaccurate, he wasn't intentionally or deliberately doing so, is that right?

A. Yes.

Olsson was on vacation in Florida and had not been present during Rawson's trial testimony. On April 16, 1981, while he was in Florida, he was called by an attorney who told him that Rawson had testified that she had sent money to Kelly. Olsson's reply was "I don't believe it."

Olsson returned home a few days later and was telephoned by Macdonald. Olsson had not talked to Rawson prior to Macdonald's call, although he did talk to her prior to his testimony at trial. Macdonald summarized Rawson's testimony. According to Macdonald's testimony, Olsson told him that Rawson had always told him she had no knowledge of money going to Kelly, but that he (Olsson) didn't believe her.[10] With respect to his conversation with Olsson, Macdonald testified as follows in response to questions from the court.[11]

THE COURT: Specifically, what was your perception . . . following your conversation with Olsson, whether or not she had told Olsson that she had put money in an envelope and put Kelly's name on the envelope?

THE WITNESS: Well, it ruined my weekend.

THE COURT: Just answer my question.

THE WITNESS: The answer to the question, Your Honor, was that my perception was that Olsson was going to say that Audrey had not told him about her role in the generation and delivery of money to Senator Kelly.

.     .     .     .     .

8. Transcript of Evidentiary Hearing on Defendant's Motion for Judgment of Acquittal, pp. 96 97 (Feb. 23 24, 1982) [hereinafter cited as "TR(I)" (day one) and "TR(II)" (day two)].

9. TR(I) 101 02.

10. Rawson had waived her attorney-client privilege during her testimony at trial.

11. TR(I)—134, 136.

THE COURT: As of the conclusion of your conversation on the 24th, as you have described it to us, it was your perception that as of that moment Mr. Olsson's position would be one that would contradict the testimony of Mrs. Rawson to the effect that she had told him that she had put money in an envelope and put Kelly's name on the envelope; is that right?

THE WITNESS: Yes.

Macdonald testified further that Olsson had told him he had received a call from McLaughlin advising him he would be summonsed as a witness at trial.

During his testimony at the evidentiary hearing, Olsson contradicted Macdonald's testimony that he (Olsson) had ever said he did not believe what Rawson had consistently told him about having no knowledge of any payments to Kelly. On that point Olsson testified, "I have never said to anybody that I did not believe Mrs. Rawson on anything she told me." [12] Olsson told Macdonald that whatever he testified to at trial would be the truth. Macdonald's reply, according to Olsson, was "Well, I hope you don't have too much to say." [13]

Sometime following his telephone conversation with Macdonald, Rawson visited Olsson. During that meeting, Rawson told Olsson that she "got confused" [14] during her conference with Macdonald and that she had changed her testimony. Olsson inquired as to the manner in which she changed her testimony. Olsson's testimony as to Rawson's response to him is as follows: [15]

She said, "Well, they"—she just says "they"; she doesn't say who—"They told me that I had put Jim Kelly's name on an envelope with some money to go down to Mr. Kelly's office." And she said, "I don't recall doing that, but they seem to know something I don't know, and I saw nothing wrong with that because we have always been sending money down to Jim

Kelly's office for Masiello. So I said, 'Well, I agree that maybe I did put his name on an envelope.'"

Well, I said, "Was it your belief at that time that that money was going to Senator Kelly or just to his office for pickup by Masiello?"

She says, "I felt the same as it always has been in the past, that it was going to Kelly's office for Masiello to pick up, and," she said, "I think they confused me."

And I think I asked her pointblank then: "Did you send any money down to Mr. Kelly's office with the belief that the money was going to him personally?"

And she said, "No, that I felt it was going to the office as always in the past we had always done it and that it was going to Masiello to pick up."

McLaughlin called Olsson as a trial witness on April 27, 1981. Olsson flatly contradicted Rawson's testimony that she had told him about her giving money to Kelly. He also testified as to her conversation with him in his office in substantially the same form as quoted above.

Macdonald testified that he was not surprised by Olsson's testimony. He knew what Olsson was going to testify to as a result of his conversation with him the prior Friday. After Olsson's testimony, however, Macdonald requested and was granted a recess in order to contact Rawson to determine whether or not he wished to call her as a rebuttal witness. Macdonald understood that when perjury by an important witness on a key point came to his attention, he had a duty to disclose that perjury to the court and defense counsel.

Macdonald phoned Rawson during the recess and talked to her. The purpose of his call was to discuss Olsson's testimony and to find out what recent statements she had made to Olsson. He talked to her for about three minutes. He wanted to learn whether or not she had in fact told Olsson that

12. TR(II) 105.

13. TR(II) 103.

14. TR(II)–110.

15. TR(II)–111–12.

she had sent cash to Kelly. He also wanted to learn whether she told Olsson she had been confused when she testified she had sent cash to Kelly.

Rawson acknowledged to Macdonald that she had testified to certain matters that went beyond the information she had earlier provided to Olsson. Macdonald did not ask Rawson the specific matters she had withheld from Olsson, nor did he pursue with her whether or not she had committed perjury when she testified that she had told Olsson she had sent money in envelopes to Kelly. Macdonald felt no duty to the court or defense counsel to find out whether or not she had told Olsson about the envelopes and the money. Instead, when Rawson told him that she had in fact testified to things she hadn't told Olsson, Macdonald immediately shifted to another subject. With respect to his changing the subject, McLaughlin inquired of Macdonald as follows: [16]

Q You just told us that you suspected that she would say something to the effect that she hadn't filled Olsson in on the details of transmitting money to Kelly, is that right?

A Yes, and other things.

Q And other things. And you did not pursue that subject of whether or not she had told Olsson about the envelopes, money, writing, Kelly's name on them and transmitting them?

A That's right.

After his conversation with Rawson, Macdonald reported to the court at a bench conference in the presence of MacLaughlin as follows:

Contradictions, your Honor, but not such that I would ask the court to delay the course of the trial.[17]

16. TR(I) 57.

17. TR(I)–60.

18. *See, e.g.,* TR(I)–58.

19. TR(I)–142.

20. TR(I)–146.

21. TR(I) -147.

22. TR(I)–146. Once before, during trial, Macdonald had cited the stress on him. At a bench

Macdonald recognized that Rawson's testimony of having sent money to Kelly was important evidence for the government to have obtained in the prosecution of Kelly. He recognized also that anything that would weaken Rawson's testimony would be important to Kelly's defense. Macdonald knew that the matter of what Rawson did or did not say to Olsson concerning whether she sent money to Kelly in envelopes "could be considered material to the inquiry." [18]

In response to the court's inquiry as to why he had decided not to recall Rawson, Macdonald testified as follows: [19]

I made the judgment not to call her by weighing two things: one, is that I knew that from the basis of what she was saying, that she would refute Olsson on the Ring-Macdonald pressure point, but I had to weigh that against what mileage McLaughlin might be able to get from equivocation from her at this stage as to the completeness of her briefing of her attorney which she was going soft on at that stage.

At that stage of the evidence Macdonald believed "we were in a horse race",[20] but that the government had a good shot at winning if it did not open up "an area that would substantially weaken the case." [21] Macdonald knew that, if recalled, Rawson would be heavily cross-examined on the particular issue of what she had or had not told Olsson concerning whether or not she had sent cash to Kelly. Macdonald testified that his weariness at that stage of the trial affected his judgment as to whether or not to recall Rawson.[22]

conference, Macdonald had twice called MacLaughlin a fool. At a later bench conference Macdonald apologized to MacLaughlin and then stated:

MR. MacDONALD: Your Honor, just for the record, I want to apologize to the Court for my behavior before at the bench, and I have a feeling—it's the fifth day of a three-week trial, and I would like to think that my comments to Mr. McLaughlin would not have occurred if I had perhaps not been quite as strung out over this case.

## II

### *Professional Standards Required of U. S. Attorneys*

■ United States Attorneys, unlike most state and local prosecutors, are appointed for a term. Barring unusual circumstances, they enjoy a guaranteed tenure. That tenure affords them an independence not unlike that enjoyed by federal judges. They are free to perform their duties fairly, objectively, and without regard to transitory public reactions of approval or disapproval. And, indeed, they have an obligation to conduct their affairs in such a manner.

■ The United States attorney is not merely an advocate in the courtroom. Rather, he represents the United States of America and *all* its people, including those who may stand before the court accused of criminal activity. The United States attorney's duty is not to *win* cases brought by him. Rather, his duty is to prosecute those cases diligently and fairly, with the firm purpose of seeing to it that justice is done in the courtroom. That high standard has been forcefully articulated and memorialized by the Supreme Court:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—in-

deed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

The Department of Justice, of course, recognizes and seeks to insure that its prosecutors strive to meet this standard on a daily basis. Indeed, a Department of Justice manual entitled "Proving Federal Crimes" devotes an entire chapter to the topic of "Prosecutorial Misconduct and Vindictiveness" in order to alert its attorneys to their professional responsibilities in this regard. Significantly, the first entry in that chapter is the following forceful admonition of Justice Douglas in the case of *Donnelly v. DeChristoforo,* 416 U.S. 637, 648–649, 94 S.Ct. 1868, 1874, 40 L.Ed.2d 431 (1974):[23]

> The function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial.

■ Of course, the use by a United States attorney of evidence which he knows or should know to be false would be patently antithetical to the standards required by the Department of Justice. Indeed, such use is unacceptable conduct by any attorney, whether a public prosecutor or civilian. The Code of Professional Responsibility of the American Bar Association (ABA) provides that:

---

THE COURT: Let me tell you—I told you this before off the record in the presence of Mr. McLaughlin: I like you. I like your style. I think you are a good lawyer. I think that you'd be well advised to channel that great talent you have or harness it just a little bit and make sure that you don't overstep the bounds of propriety.

As far as I am concerned, you owe me no apology. I hold you in nothing but high regard.

MR. McLAUGHLIN: You have no problem with me. I accept the apology on the record. . . . end of conference at the bench.)
Transcript of April 10, 1981 at pp. 2–9. *U. S. v. Kelly,* 519 F.Supp. 1029, 1039 (D.Mass. 1981).

**23.** United States Department of Justice, *Proving Federal Crimes,* Chapter 8 (J. Cissell ed. 1980).

(A) In his representation of a client, a lawyer shall not:

.    .    .    .    .

(3) Conceal or knowingly fail to disclose that which he is required by law to reveal.

(4) Knowingly use perjured testimony or false evidence.

(5) Knowingly make a false statement of law or fact.

(6) Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false.

.    .    .    .    .

(B) A lawyer who receives information clearly establishing that:

(1) His client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon his client to rectify the same, and if his client refuses or is unable to do so, he shall reveal the fraud to the affected person or tribunal....

(2) A person other than his client has perpetrated a fraud upon a tribunal shall promptly reveal the fraud to the tribunal.

Disciplinary Rule 7–102 of The Code of Professional Responsibility. ABA Ethical Consideration 7–26 provides:

The law and Disciplinary Rules prohibit the use of fraudulent, false or perjured testimony or evidence. A lawyer who knowingly participates in introduction of such testimony or evidence is subject to discipline. A lawyer should, however, present any admissible evidence his client desires to have presented unless he knows, or from facts within his knowledge should know, that such testimony or evidence is false, fraudulent, or perjured.

The American Bar Association ethical standards impose upon public prosecutors the duty of pursuing the truth, regardless of what effect that effort may have on the outcome of the case:

The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict.... [I]n our system of criminal justice the accused is to be given the benefit of all reasonable doubts. With respect to evidence and witnesses, the prosecutor has responsibilities different from those of a lawyer in private practice; the prosecutor should make timely disclosure to the defense of available evidence, known to him, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment. Further, a prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage the prosecutor's case or aid the accused.

ABA Ethical Consideration 7–13.

The Department of Justice manual provides clear and unequivocal guidance for United States Attorneys and their staffs. One section, entitled "Proof Presentation Problems," states:

1. *False or Misleading Testimony*

The due process guarantee and the fair trial right of the accused are destroyed when a prosecutor obtains a conviction with the aid of evidence which he actually knows, or should know, to be false and allows it to go uncorrected. Deliberate deception of a court and jurors by the presentation of false evidence is reprehensible and incompatible with "rudimentary demands of justice."
... It is immaterial whether the prosecutor consciously solicited the false evidence. It is also immaterial whether the false testimony directly concerns an essential element of the crime charged or it bears only on the credibility of a witness.... If there is any reasonable likelihood that the false testimony could have affected the jury's judgment, a new trial must be ordered....
The prosecutor's duty to correct the false testimony arises when the false evidence appears, or as soon as he becomes aware of inaccuracies....

*Proving Federal Crimes, supra,* at 8–3 to 8–4 (citations omitted).

## III

*Macdonald's Conduct*

Applying the standard of conduct required of U. S. Attorneys to the facts of this case, it is clear that Macdonald failed to meet his legal and ethical responsibilities to the court and the defendant in his handling of certain aspects of the Masiello-Rawson-Olsson testimony. At trial, Masiello and Rawson were key government witnesses. Indeed, Macdonald acknowledges that a prima facie case could not be made out against Kelly without the testimony of Masiello.

■ Macdonald admits that he considered Masiello's testimony to be false concerning the manner and method by which cash was allegedly paid Kelly. And yet, Macdonald failed to notify either the court or defense counsel of what he considered to be false testimony. Macdonald attempted to justify that failure by drawing a distinction between false testimony and perjured testimony. Whatever academic distinction may be divined between false and perjured testimony for other purposes, it is clear that the ethical standards required of prosecutors make no such distinction:

> The law and Disciplinary Rules prohibit the use of *fraudulent, false* or *perjured* testimony or evidence. A lawyer who knowingly participates in introduction of such testimony or evidence is subject to discipline.

ABA Ethical Consideration 7–26. (emphasis supplied).

■ The deliberate use of false testimony by a prosecutor violates a defendant's due process rights. *Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972). Moreover, even when a prosecutor has not solicited the false testimony, he has the duty of correcting it as soon as it occurs. *See, e.g., Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). The ABA Code of Professional Responsibility requires that when a lawyer receives information clearly establishing that a person other than his client has perpetrated a fraud during a trial, that lawyer must "promptly reveal the fraud to the tribunal." Disciplinary Rule 7–102 of The Code of Professional Responsibility ("CPR").

Macdonald was either ignorant of, or chose to ignore, the clear mandates of his legal and ethical responsibilities. Instead, he devised and applied his own code of conduct and remained silent about Masiello's false testimony. In doing so, he seriously breached his responsibilities to the defendant and to the court.

Even more disturbing was Macdonald's handling of the Rawson-Olsson testimony. That testimony was of significant interlocking impact at trial. In particular, Rawson's testimony that she sent money in envelopes to Kelly was extremely important to the government's case. It tended to corroborate the testimony of Masiello that Kelly was on the take, even though Masiello and Rawson were at odds on the method of payment.

For months prior to the date of her solo interview with Macdonald, Rawson consistently denied sending money to Kelly. What happened during that meeting is uncertain. Macdonald denies any undue pressure on Rawson. She has no memory of anything that occurred at the meeting. That vacuum makes the testimony of Olsson all the more significant in terms of examining Macdonald's conduct.

Olsson had been Rawson's lawyer all during the investigation. The only time Rawson was interviewed by government officials, without Olsson being present, was when she changed her story about sending money to Kelly. At trial she testified that she had great faith in Olsson and had told him everything she knew about the Masiello-Kelly relationship. She specifically testified that she had told Olsson about her having sent money to Kelly. That was key testimony. Given her statement of confidence in Olsson, and her assertion that she told him "everything", a failure on her part to have told him of her own direct involvement would have rendered her testimony vulnerable to attack as a recent fabrication.

Macdonald knew first-hand, from his Friday, April 23, 1981 telephone call to Olsson,

that he would refute Rawson's testimony that she ever told him she had sent money to Kelly. Macdonald's understanding was that Olsson was to testify on the following Monday. Macdonald was disturbed by what Olsson had told him. Indeed Macdonald testified that his talk with Olsson "ruined" his weekend. Clearly Olsson's expected testimony had the potential to severely damage Rawson's credibility.

After his call to Olsson, Macdonald was on notice from a member of the bar that one of his key witnesses may have testified falsely concerning a material matter. And yet, Macdonald did not bring this information to the attention of either the court or defense counsel.

As it turned out, Olsson did testify on the following Monday. He was an extremely forceful and credible witness. He had no axe to grind in the case. He did not know Kelly. He thought highly of Rawson, both of them being communicants at the same church. Olsson unequivocally contradicted Rawson's testimony that she had ever told him that she had sent money to Kelly. Moreover, he testified that she had told him that she had been confused during her interview with Macdonald and that, despite her testimony to the contrary, she did not send money to Kelly.

A serious credibility issue had, therefore, surfaced between the testimony of Rawson and Olsson. A recess was declared to permit Macdonald to call Rawson to determine her reaction to Olsson's testimony and to determine whether or not to call her as a rebuttal witness.

■ Macdonald's recess telephone conversation with Rawson was brief. She essentially corroborated Olsson by admitting to Macdonald that she had testified to certain matters at trial that she had not in fact told Olsson. When Macdonald heard this, he did not pursue the matter by inquiring as to the detail of her prior false testimony. Instead, he changed the subject, talked to her about another matter, and then terminated the conversation. At that point, he

had violated ABA Ethical Consideration 7–13:

> [A] prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage the prosecution's case or aid the accused.

■ Given his conversation with Rawson, Macdonald determined not to call her as a rebuttal witness, and reported back to the court as follows:[24]

> Contradictions, Your Honor, but not such that I would ask the court to delay the course of the trial.

That report was materially misleading to both the court and defense counsel and was in violation of the most basic ethical standards. A lawyer shall not "conceal or knowingly fail to disclose that which he is required by law to reveal." CPR Disciplinary Rule 7–102(A)(3). It also violated ABA Ethical Consideration 7–13, which states:

> The prosecutor should make timely disclosure to the defense of available evidence, known to him, that tends to negate the guilt of the accused.

and the Department of Justice manual:

> The due process guarantee and the fair trial of the accused are destroyed when a prosecutor obtains a conviction with the aid of evidence which he actually knows, or should know, to be false and allows it to go uncorrected.... It is immaterial whether the prosecutor consciously solicited the false evidence. It is also immaterial whether the false testimony directly concerns an essential element of the crime charged or it bears only on the credibility of a witness.

*Proving Federal Crimes, supra,* at 8–3 (citations omitted).

Of particular concern are Macdonald's reasons for not inquiring further of Rawson, or not calling her back to the stand, or not more fully and accurately informing the court and defense counsel as to the import of his telephone call to her. Macdonald testified that he knew the case was close and that he was in a "horserace." He also knew that, if called back to the stand, Rawson would be subject to intense cross-exami-

---

**24.** *See* note 17 *supra.*

nation on the material point of what she did or did not say to Olsson concerning why she had testified the way she did at trial concerning payments to Kelly. He decided not to call her back, because he did not want to reopen a sensitive area that could substantially weaken his case.

Macdonald's failure to recall Rawson, standing alone, could be excused as a tactical choice. But when considered together with his intentionally inadequate inquiry of her during his telephone call, and misleading report to the court and defense counsel, Macdonald's conduct is inexcusable. After talking to Rawson, he alone had information significant to the issue of whether Rawson may have testified falsely. If Macdonald had called her back as a witness, the jury would have had an opportunity to hear the whole story. If he had at least been more candid in his report to the court, there would have been the option to defense counsel, armed with knowledge of her potential vulnerability, to call Rawson as a witness—or request the court to order a *voir dire* examination of her out of the jury's presence. Macdonald's tactical choice effectively foreclosed all of these options, buried the opportunity for clarifying testimony and, as a consequence, seriously prejudiced the rights of the defendant.

### IV

#### The Remedy

Given the demonstrated prosecutorial misconduct by Macdonald, the court must now determine what remedy would be fair to both the defendant and the public. Because Macdonald's improprieties concerned material testimony of two key witnesses, this court would have had the obligation to grant Kelly a new trial, had there been a conviction. But Kelly was not convicted, and a new trial is available to him notwithstanding any action by the court on this motion.

■ An obvious question is what benefit does a finding of prosecutorial misconduct

have to Kelly, given the fact that he is already entitled to a new trial. Under the circumstances of this case, the answer to that question appears to be that he gains no apparent advantage.[25] Whatever Macdonald's motives were, his tactics were clearly not an effort to gain a mistrial. There is, therefore, no double-jeopardy bar to a retrial here. *Oregon v. Kennedy,* —— U.S. ——, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982.)

■ Given the fact there will be a retrial, the further question remains as to what remedy will protect the public's interest in ensuring that such prosecutorial misconduct will not be repeated. The court posed this very question to Deputy U. S. Attorney Mark Wolfe, who represented the government during the evidentiary hearing, but was not a member of the U. S. Attorney's staff during the prosecution of this case. Without conceding the issue of prosecutorial misconduct, Mr. Wolfe had the following to say to this court concerning an appropriate remedy:[26]

Certainly, there are remedies focused on prosecutors as lawyers if they have violated their ethical duties, and that is really the way these things should work when one represents the public. The client ought not to be penalized, the citizens of the Commonwealth of Massachusetts, of this ethical violation because knowing use of false testimony is an ethical violation as well as a constitutional issue. There are remedies that can focus on the lawyer. In this case, the lawyer is a prosecutor.

Mr. Wolfe's views echo those of the Court of Appeals for the Second Circuit:

Reversal is an ill-suited remedy for prosecutorial misconduct; it does not affect the prosecutor directly, but rather imposes upon society the cost of retrying an individual who was fairly convicted.

*United States v. Modica,* 663 F.2d 1173, 1184 (2nd Cir. 1981). The court in *Modica* discussed extensively the issue of alterna-

---

**25.** One possible ancillary effect of the evidentiary hearing, however, is that Rawson, having no memory of any relevant events, or of her prior testimony, now may well be an incompetent witness. This is an issue best raised before the trial judge in the form of either a

motion to admit, *U. S. v. Barletta,* 652 F.2d 218 (1st Cir. 1981), or a motion to suppress, Fed.R. Cr.Proc. 12(b).

**26.** Transcript of Final Arguments (May 27, 1982).

tive sanctions for prosecutorial misconduct. *Id.* at 1182–1186.

This court has repeatedly stated that the task of ensuring that attorneys conduct themselves pursuant to recognized ethical precepts falls primarily upon district courts.

*Id.* at 1184. One of the possible alternative remedies recited by the court was that of "a formal reference to the appropriate local grievance committee to assess the need for disciplinary proceedings." *Id.* at 1185.

This court concludes that dismissal of this indictment would not be in the public's interest. The public interest is to have this indictment tried, and that interest should not be negated by the improper actions of an assistant U. S. Attorney. This court determines that, given the circumstances of this case, the public interest requires 1) that the defendant's motion to dismiss be denied and that 2) the matter of former Assistant U. S. Attorney Lloyd Macdonald's conduct be referred to the Massachusetts Board of Bar Overseers to assess the need for disciplinary proceedings.

Editor's Note:

In an order of September 9, 1982 in the above case, to be separately published in Federal Supplement, Judge Tauro accepted the recommendation of the Massachusetts Board of Bar Overseers that no disciplinary proceedings be initiated against Mr. Macdonald.